(No. 75236.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. SCOTTY LEE KINKEAD, Appellant.

*Opinion filed October 19, 1995.—Rehearing denied January 29, 1996.*

MILLER, J., joined by BILANDIC, C.J., and HEIPLE, J., dissenting.

Thomas F. Geraghty, of Chicago (Arthur S. Freeman, of counsel, and Angela Coin, Rod Floro, Amy Bauman, Thomas Swigert, Steven Wernikoff, Kelly Cassidy, David Doyle, Nareen Kim, Lewis Putman, Sonya Sud and Lindsey Levin, law students), for appellant.

Roland W. Burris and James E. Ryan, Attorneys General, of Springfield, and Alan D. Tucker, State's Attorney, of Havana (Rosalyn B. Kaplan and Barbara A. Preiner, Solicitors General, and Arleen C. Anderson and Martha E. Gillis, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

In this appeal we revisit the circumstances under which a defendant who is being medicated with psychotropic drugs is entitled to a fitness hearing pursuant to section 104—21(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—21(a) (West 1992)). Recent precedent of this court has construed section 104—21(a) as conferring upon defendants, as a matter of entitlement, the right to a mental competency hearing if they are being given psychotropic drugs under medical supervision during the time of their prosecution or sentencing. *(People v. Brandon* (1994), 162 Ill. 2d 450; *People v. Gevas* (1995), 166 Ill. 2d 461.) In the case at bar, the record reveals that defendant was being treated with the antipsychotic drug Thorazine while he was in jail awaiting trial. However, the record contains very little additional information regarding the time periods and other circumstances under which the drug was administered to defendant. Although defendant's brief in this appeal refers to his receiving a regular dosage of 100 milligrams, taken during the time in which defendant entered his guilty plea and requested to be sentenced to death, such information cannot be verified from the record filed in this court. Accordingly, this court cannot meaningfully review the threshold issue of whether defendant's receipt of psychotropic drugs entitled him to a fitness hearing pursuant to section 104—21(a). Because of the importance of this issue we remand for further proceedings in which the facts relevant to defendant's usage of psychotropic medication may be obtained.

## BACKGROUND

On February 20, 1992, Gertrude Nussel, an 85-year-old woman, was slain in her home in Havana, Illinois. Defendant, Scotty Kinkead, and his companions, Leslie

Palmer and Tara Poppenhager, were arrested a week later. They were charged with various offenses including murder, armed robbery, residential burglary, and home invasion. Leslie Palmer entered a "blind," or open, plea of guilty on one count of intentional murder, as well as other counts alleging murder, home invasion and residential burglary. He was sentenced to death. A majority of this court affirmed his convictions and sentence. (*People v. Palmer* (1994), 162 Ill. 2d 465.) Poppenhager received a five-year prison sentence in exchange for testifying against defendant and pleading guilty to the lesser charges of residential burglary and concealing a homicide.

Before defendant's trial, the State offered to forgo seeking the death penalty in exchange for defendant's plea of guilty to four of the six counts pending against him, including one count of felony murder based on armed robbery. Under this plea, defendant would not be admitting to intentionally killing the victim. Defendant accepted the plea agreement. However, a few days before the negotiated plea was to be entered, and apparently without consulting with counsel, defendant announced his intention to have the court sentence him to death. On October 19, 1992, during what was to have been a pretrial conference in which the negotiated plea was to be presented to the court, defense counsel informed the court that defendant had changed his mind regarding the plea agreement and desired to plead guilty to the charges without availing himself of the State's agreement not to seek the death penalty. Defendant also told defense counsel he did not want her to call the mitigation witnesses she had planned to call on his behalf.

The court asked defense counsel if she believed defendant to be competent to make such decision. She responded in the affirmative, citing defendant's coopera-

tion with her in preparing for trial and the lack of any indication he suffered from a mental illness that would prevent him from making free and independent decisions. She informed the court that defendant had participated in and agreed with the decision to seek the negotiated plea agreement that would spare his life. Counsel characterized defendant's decision as a mistake of huge proportions. Counsel also expressed her opinion that defendant did not believe he would be able to endure a long prison term or natural life imprisonment and therefore desired the death penalty.

The court inquired of defendant whether he had any concerns over his counsel's representation and defendant said, "She did a great job." The court noted that defendant's changed intent was tantamount to entering an open plea to all of the counts before the court. The court then explained the State's burden at trial and the procedures that would be followed if a trial were held before a jury. The court inquired into defendant's education and ability to read and write. Next, the court commented that defendant appeared able to comprehend the proceedings and work with counsel. Defendant stated that he could understand what was happening. He said he wanted the death penalty because he felt it would be better for him than serving a long sentence in prison. The court offered defendant more time to consider the matter, which he twice declined. Toward the end of the proceedings on October 19, 1992, defendant accepted the court's offer for more time to consider his decision and the matter was continued to October 21, 1992.

When the proceedings resumed, defense counsel reiterated for the record that she had strongly advised defendant not to repudiate the negotiated plea agreement and felt it was "a terrible mistake and absolutely wrong decision." The court asked defendant whether he

believed he was under any kind of mental disability and defendant answered in the negative. Defense counsel also stated her belief that defendant was competent to proceed with his plea. Counsel based her opinion on conversations with defendant as well as the fact that he had undergone a psychological evaluation several weeks earlier, which apparently did not reveal a mental condition of the type that would interfere with his ability to comprehend his criminal prosecution. In response to the court's inquiry, defendant stated his belief that his counsel had done an adequate job and spent sufficient time on his case. The court then announced its opinion that, based on its observations of defendant in the courtroom and defendant's expressed intentions, defendant was "certainly competent to proceed" to the entry of the guilty plea.

The counts of the indictments to which defendant pleaded guilty included one count of first degree murder based on the killing of the victim during the course of armed robbery, armed robbery, residential burglary, and home invasion. The State dismissed two other counts of first degree murder, one based on an intent to kill and the other based on killing in the course of residential burglary. The court then explained the effect of a jury waiver and inquired whether defendant understood that he was subject to a possible sentence of death by rejecting the State's prior plea agreement. The court asked, "Why are you doing that Mr. Kinkead?" Defendant said, "I feel it is right for me."

The court outlined the sentencing procedures and told defendant that even with the guilty plea there would be a "full-fledged sentencing hearing" and the State would bear the burden of proving death eligibility and presenting evidence in aggravation. The court reviewed the sentencing options and defendant indicated his understanding of the court's admonitions. The State

then offered the factual basis for the plea of guilty, which may be briefly stated.

The victim, Gertrude Nussel, was killed in her home in the evening of February 20, 1992. The cause of death was massive hemorrhaging by reason of a slash/stab wound to her throat. Other injuries to the throat area indicated probable strangulation. Leslie Palmer, defendant, and Tara Poppenhager were arrested approximately one week after the homicide. Both Palmer and defendant gave statements admitting their presence in the victim's home and their participation in the crimes charged, but each claimed that the other had used the knife to cut Nussel. Palmer admitted using choke holds, or "sleeper holds," to subdue the victim. Scrapings taken from under the victim's fingernails were not consistent with defendant's blood type. Poppenhager admitted having knowledge of the robbery plan and driving the car, but denied involvement in the murder. She was not present at Nussel's house and did not witness what occurred. According to Poppenhager, defendant admitted to her on three occasions that he had caused the victim's death.

Following the formal entry of defendant's plea of guilty and defendant's jury waivers, the court ordered a presentencing investigation and report and continued the case for sentencing to November 23, 1992. At the sentencing hearing, the key issue regarding defendant's eligibility for the death penalty was whether defendant, in the course of the armed robbery, intended to cause the victim's death or knew that his actions created a strong probability of death or great bodily harm. To establish defendant's intent, the State presented the testimony of Tara Poppenhager, who testified regarding her knowledge of the events leading to and following the homicide. She testified that defendant had told her, in the days following the murder, that he had cut the victim's throat and, when Poppenhager protested that

they were going to get caught, said he would kill her if she did not "shut up about it."

Poppenhager conceded that she had not told the police, in either of her two statements taken within a week of the murder, that defendant admitted cutting the victim's throat or that he had threatened Poppenhager. She admitted that she had lied to the police about certain matters but explained her conduct as resulting from fear of defendant. Poppenhager, who originally had been charged with the same offenses as Palmer and defendant, also admitted that several months after her arrest, while she was in jail, she had been offered a plea agreement contingent upon her testifying against defendant. Under the agreement, she would plead guilty to residential burglary and concealing a homicide and the State's Attorney would recommend a five-year prison term.

Defendant's high school teacher, who had taught in Astoria's schools for 30 years, testified regarding Poppenhager's reputation for truth in the community, stating that "she is not really very reliable" and "is not known as a truth teller."

Police officers who investigated the crimes also testified at the death-eligibility phase of defendant's sentencing hearing. The detective who took defendant's statement testified that defendant admitted being present in the victim's house and participating in the crimes but denied being the one who cut the victim's throat. At no point in his statement did defendant tell the detective that he had struck, choked, cut, or otherwise injured the victim.

The court ruled that the State had sustained its burden of proving the aggravating factors that defendant was 18 years old or older and intentionally caused the death of the victim during the course of an armed robbery. Accordingly, the court found defendant death-eligible.

The presentencing report was introduced into evidence for the hearing in aggravation and mitigation. The report disclosed defendant's statement that a doctor, affiliated with the Fulton County mental health department, prescribed "Thorozene [sic] at bedtime while [defendant] is in jail, to help him with his nerves and sleeplessness." Several other drugs that were given to defendant in the past for his depression were also listed. The report referred to defendant's past suicide attempts, his treatment at Menard Psychiatric Center, and incidents of defendant's "multiple self-inflicted cigarette burns on his arms." According to the presentencing report, the above matters were verified by prison records.

In aggravation, the State presented evidence of defendant's criminal history, which included property crimes and one conviction for residential burglary. The daughter of the deceased read a victim impact statement. The State also presented previously undisclosed evidence that defendant had cut the back of another inmate in the Fulton County jail on November 5, 1992. Defense counsel objected to the State's introduction of such information as a violation of discovery, but declined the court's offer of a one- or two-week continuance, explaining that her client had "pressured" her to conclude the proceedings.

In mitigation, defense counsel called two witnesses. Yvonne Farwell, a special education teacher at defendant's high school, had known defendant all of his life and knew his parents. Farwell testified that when defendant was young, in early grade school or preschool, his mother left him and his siblings. Defendant's paternal grandmother took him in and became his guardian. His father's appearance in his son's life was sporadic. Farwell testified that defendant did well in her classes when he was in high school but he would

miss a lot of days. She believed that he was able to do what he was asked, if it was explained in a way he could understand it, but that he was missing some of the basic skills necessary to survive in a regular classroom. Farwell also testified that defendant "had a real talent for being his own worst enemy. He was in self-mutilation." She cited cigarette burns and marks carved into his arms or hands. He expressed feelings of hopelessness to her and dropped out in the middle of his sophomore year. Defendant was learning-disabled, not mentally retarded. During the time he was in school, Farwell did not observe any violent tendencies or behaviors on defendant's part.

John Richard Day, a clinical psychologist from Peoria, testified that he interviewed defendant on three occasions in the summer of 1992. On the first visit, June 17, 1992, Dr. Day administered the Minnesota Multiphasic Personality Inventory and other tests. On July 17 defendant underwent a psycho-dynamic interview. On August 28, defendant was brought to Dr. Day for additional psychological testing. Dr. Day stated that his primary diagnosis was "anti-social personality disorder. Contributing to that would be, alcohol dependence, dysthymia, which is related to manic depressive disorder. And a history of attention deficit disorder and learning disability which would go back to childhood and adolescence." Dr. Day further related his understanding of defendant's family background and upbringing and what he believed was defendant's pervasive "very low self perception," or lack of self-esteem, which was connected not only to his parents' rejection of him but to his attention deficit disorder and learning disabilities, which were beyond his control. Dr. Day noted that defendant's self-destructive tendencies and self-mutilation also reflected his low self-esteem and desire for punishment. Dr. Day also concluded that, based on

his test results and report of personality profiles, defendant was a follower, not a leader. He also exhibited poor impulse control, which was common for children with attention deficit disorder, and the use of alcohol would further weaken his impulse controls. The doctor testified, in response to questions by the prosecution, that defendant's conduct on the night of the murder could be characterized as "impulsive alcohol mediated and certainly if not peer induced, peer mediated." Dr. Day stated that defendant's behavior on the night of the murder was unlikely to be the product of deliberate consideration but instead was "much more impulsive, much more specific to the events of the moment rather than thinking of the consequences."

Defendant read a statement in allocution, apologizing for the pain of the victim's family and expressing sorrow for the families of his codefendants as well. He stated his desire to change the events of February 20 and his regret that he was drunk that night, as he had been for many other nights. He admitted his responsibility for taking part in the crimes but he also reiterated that he did not have any intent or even any idea that the victim would be harmed that night. He said he had deep regret for the mistakes in his life and expressed despair and emptiness. He asked the judge to impose the death penalty.

The trial court sentenced defendant to death by lethal injection. Defendant appealed directly to this court pursuant to Supreme Court Rule 603 (134 Ill. 2d R. 603).

## ANALYSIS

Before defendant's convictions and death sentence may be meaningfully reviewed by this court we must decide a critical threshold issue: Was defendant entitled to a fitness hearing to assess whether he was competent to participate in and understand his defense and sentencing, before his guilty plea was accepted and the

death penalty imposed? Section 104—21(a) provides in pertinent part that a "defendant who is receiving psychotropic drugs or other medications under medical direction is *entitled* to a hearing on the issue of his fitness while under medication." (Emphasis added.) (725 ILCS 5/104—21(a) (West 1992).) In the case at bar, defense counsel did not request a fitness hearing, nor did the trial court determine that such hearing was necessary. However, the defendant's use of Thorazine was brought out in the presentencing report ordered by the court. It does not appear from the record that any inquiry was made to determine whether and to what extent defendant's use of such medication might have affected his fitness to assist in his defense.

Initially, we note that defendant did not raise a challenge to his mental competence until the filing of this appeal, which raises the question of waiver. This court has held that "where a defendant's capacity is the issue in question, it is anomalous to even consider the concepts of waiver" because a defendant whose mental state may render him unfit to stand trial "can scarcely be expected to raise the question of fitness in the first instance." (*Brandon*, 162 Ill. 2d at 457.) In *Brandon*, we also noted application of the plain error doctrine. The issue of a defendant's fitness for trial may be raised before, during, or after trial. (725 ILCS 5/104—11 (West 1992); see *People v. Johnson* (1984), 121 Ill. App. 3d 859 (reversing for fitness hearing on issue of defendant's fitness to stand trial where trial court had found defendant fit for trial but unfit for sentencing).) Trial counsel's failure to pursue defendant's right to request a competency hearing pursuant to section 104—21(a) does not waive the issue (see *Brandon*, 162 Ill. 2d 450), and where the record indicates that a defendant's use of psychotropic medication was proximate to the time he pleaded guilty and was sentenced, the trial court has a duty to

further investigate the defendant's fitness for trial. (*Gevas*, 166 Ill. 2d at 469.) In light of these principles, we decline to apply waiver in the case at bar to preclude consideration of whether defendant's use of psychotropic medication while incarcerated entitled him to a fitness hearing.

Due process bars prosecution of a person who is not competent to stand trial. (*E.g., Drope v. Missouri* (1975), 420 U.S. 162, 172, 43 L. Ed. 2d 103, 113, 95 S. Ct. 896, 904; *Pate v. Robinson* (1966), 383 U.S. 375, 385, 15 L. Ed. 2d 815, 822, 86 S. Ct. 836, 842; *People v. Eddmonds* (1991), 143 Ill. 2d 501, 512.) Fitness to stand trial refers to a defendant's ability to understand the nature and purpose of the proceedings and to assist in the defense. Although a defendant's fitness is presumed by statute (725 ILCS 5/104—10 (West 1992)), the circuit court has a duty to order a fitness hearing whenever there exists a *bona fide* doubt as to the ability of the defendant to understand the charges and participate in his defense. (725 ILCS 5/104—10 (West 1992); *People v. Murphy* (1978), 72 Ill. 2d 421; *People v. Burson* (1957), 11 Ill. 2d 360.) Whether a *bona fide* doubt of defendant's competence has been raised is generally held to be within the discretion of the trial court. *E.g., Murphy,* 72 Ill. 2d 421; *People v. Stanhope* (1969), 44 Ill. 2d 173, 179.

In *Gevas,* 166 Ill. 2d at 469, we observed, "The legislature has equated the administering of psychotropic medication to a defendant with a *bona fide* doubt as to fitness to stand trial." Therefore, the broad discretionary standard ordinarily applied in deciding whether there exists a *bona fide* doubt yields when the accused is taking psychotropic medication under medical direction at the time of his trial or sentencing. (See *Brandon,* 162 Ill. 2d 450.) In *Brandon,* we held that where section 104—21(a) applies, a hearing is mandatory, not subject to the trial court's discretion, and that

defense counsel's failure to move for such hearing, where applicable, constitutes ineffective assistance. In *Gevas*, we recognized that the circuit court has the duty to hold a fitness hearing when defense counsel requests such a hearing based on defendant's use of psychotropic medication. Our decisions in *Brandon* and *Gevas* were premised on the General Assembly's recognition that "psychotropic medication is an important signal that a defendant may not be competent to stand trial." (*Brandon*, 162 Ill. 2d at 457; *Gevas*, 166 Ill. 2d at 468-69.) We held that the defendants had been deprived of their right to a fitness hearing pursuant to section 104—21(a) and we further determined that it would not be possible to conduct a meaningful hearing, retrospectively, on the issue of the defendants' fitness at the time of trial and sentencing. (See *Gevas*, 166 Ill. 2d at 471.) Accordingly, we reversed the defendants' death sentences and underlying convictions and remanded to give the State the opportunity to again prosecute the defendants.

In the case at bar, the State argues that defendant was not entitled to a fitness hearing at the time of his plea and sentencing. According to the State, Dr. Day's psychological evaluation of defendant weeks before the court's acceptance of the guilty plea indicated that defendant suffered from depression, but was cooperative and competent and did not suffer from a mental disease or disorder. The State additionally notes that the trial court made significant efforts to ensure that defendant understood each phase of the proceedings. Further, the State contends, there is no suggestion in the record that defendant was unable to understand the relevant events or was incompetent to assist his attorney in the preparation of his case. Accordingly, the State insists that there was no *bona fide* doubt regarding defendant's competence and the trial court did not abuse its discretion in failing to hold an evidentiary hearing on defendant's

fitness. In support, the State cites certain appellate court opinions, decided before *Brandon* and *Gevas*, which took the view that a defendant's ingestion of psychotropic medication was, in effect, but one factor in the trial court's *bona fide* doubt analysis. See *People v. Lopez* (1991), 216 Ill. App. 3d 83, 87-88; *People v. Balfour* (1986), 148 Ill. App. 3d 215, 226; *People v. Tilson* (1982), 108 Ill. App. 3d 973, 978.

The State's reliance on cases such as *Lopez*, *Balfour* and *Tilson* fails to take into account the plain terms of section 104—21(a) of the Code of Criminal Procedure and this court's reasoning and holdings in *Brandon* and *Gevas*. While the trial court ordinarily is accorded broad discretion in gauging whether a *bona fide* doubt of defendant's competence exists, the instant case involves the possible influence of psychotropic medication, which may cause significant alteration of thought processes, mood, or general demeanor. In *Brandon* we considered the legislative mandate embodied in section 104—21(a) and rejected the argument that the trial court's personal observation of the defendant's deportment in court was an adequate substitute for a formal fitness hearing, particularly when psychotropic drugs are involved. (*Brandon*, 162 Ill. 2d at 459-60.) Federal cases similarly have rejected the argument that a court may decline to hold a fitness hearing if the defendant appeared rational and competent before and during trial. *E.g., Pate v. Robinson* (1966), 383 U.S. 375, 386, 15 L. Ed. 2d 815, 822, 86 S. Ct. 836, 842; *Griffin v. Lockhart* (8th Cir. 1991), 935 F.2d 926, 931 (holding that if there is "sufficient doubt" about the competency of an accused, later conduct of the accused " 'cannot be relied upon to dispense with a hearing' ").

In light of these authorities, we reject the State's argument that the trial court's observations of defendant's demeanor during the proceedings is dispositive of

the fitness issue in the case at bar. If personal observation were the decisive factor in whether to hold a section 104—21(a) hearing, the effects of psychotropic medications on a defendant's mental functioning would be left to speculation or uninformed opinion. Such a result would render the courts' application of section 104—21(a) directory rather than mandatory, which in turn would erode our precedent of *Brandon* and *Gevas*. We believe that the legislature intended, through the plain language of the statute, to remove the determination of a defendant's fitness from the subjectivity of personal observation and place the question in the formal context of a fitness hearing. Psychotropic medications are potent drugs and their effect on the mind and behavior of an accused may not be easily determined or fully understood, particularly by nonmedical personnel. A fitness hearing provides the vehicle by which the court may ascertain whether the drugs are influencing the defendant's subjective decision regarding the pursuit of available defenses. As Justice Kennedy cautioned in *Riggins v. Nevada* (1992), 504 U.S. 127, 143-44, 118 L. Ed. 2d 479, 494-95, 112 S. Ct. 1810, 1819-20 (Kennedy, J., concurring), antipsychotic drugs may flatten a person's will and distort his or her thought processes, interfere with the attorney-client relationship, and drain the defendant's desire for self-preservation. (See *Gevas*, 166 Ill. 2d at 469-71.) This court also has recognized the "substantially invasive nature of psychotropic substances and their significant side effects" in the context of mentally ill patients' right to refuse psychotropic medication as part of their treatment. (*In re C.E.* (1994), 161 Ill. 2d 200, 214; see also Gutheil & Appelbaum, *"Mind Control," "Synthetic Sanity," "Artificial Competence," and Genuine Confusion: Legally Relevant Effects of Antipsychotic Medication*, 12 Hofstra L. Rev. 77 (1983).) We conclude that personal observation of an ac-

cused who is on such medication does not replace the need for a fitness hearing.

The State further contends that the outcome of the instant case would not have differed even if defense counsel had requested and defendant had received a full fitness hearing. (See *Brandon*, 162 Ill. 2d at 461-64 (Miller, J., dissenting, joined by Bilandic, C.J., and Heiple, J.).) The State's reasoning is flawed: it is illogical to permit a court to surmise that a defendant would have been found fit without holding a hearing intended to determine that very issue. Moreover, such an approach misapprehends the purpose of a section 104—21(a) fitness hearing and encourages unprincipled speculation into matters requiring medical expertise. Therefore, we hold that when a defendant is entitled to a hearing on competency, as when the elements of section 104—21(a) are clearly satisfied, prejudice to defendant ordinarily will be presumed when his or her counsel fails to request such fitness hearing. (See *Brandon*, 162 Ill. 2d 450.) As a corollary, if the trial court has notice that defendant is taking psychotropic medications, or when counsel requests a fitness hearing based on section 104—21(a), the court has a duty to inquire into the matter and hold a hearing to ascertain whether the use of such medications has rendered defendant unfit to assist in his or her defense. (See *Gevas*, 166 Ill. 2d at 469.) In contrast, no hearing is required where the defendant's right to a fitness hearing pursuant to section 104—21(a) is not established, as where there is no indication that defendant was being treated with psychotropic medication during the relevant times, and the trial court has not otherwise abused its discretion in concluding that no *bona fide* doubt of unfitness is present.

The instant case differs in certain respects from *Brandon* and *Gevas*. The bare fact that defendant was treated with Thorazine while in jail is all that exists in

the record on the issue of defendant's medication. At the time defendant rejected the negotiated plea, trial counsel informed the court that she did not believe that defendant was unfit, based on her conversations with defendant and Dr. Day's psychological examination of him. In contrast, the trial attorneys in *Brandon* and *Gevas* raised at least a question regarding their clients' fitness at some point in the proceedings, before or after conviction and sentencing. That defendant's counsel in the case at bar never questioned defendant's competence to proceed factually distinguishes the instant case from *Brandon* and *Gevas*. Nonetheless, such distinction does not, by itself, resolve the underlying question of whether and to what extent the psychotropic medication may have influenced defendant's decision to seek the death penalty. We therefore review the specific facts that were persuasive in *Brandon* and *Gevas* respecting the right to a fitness hearing.

In *Brandon*, the trial court appointed an expert to conduct an evaluation of defendant but concluded that the expert's report did not raise a *bona fide* doubt of the defendant's competence to stand trial. Thereafter, defense counsel moved for a fitness hearing on the ground that defendant's learning disability prevented him from assisting in the defense. The court conducted a hearing to determine whether a *bona fide* doubt of fitness existed, but concluded that grounds for a full fitness hearing had not been established. On appeal, we noted that the record of the sentencing hearing revealed that the defendant was taking antipsychotic drugs as part of a treatment program *while incarcerated* and that he was on the medications *continuously during his trial and throughout the sentencing proceedings*. Because defense counsel did not specifically raise the issue of this drug treatment as grounds for a fitness hearing pursuant to section 104—21(a), we held that counsel had rendered ineffective assistance.

In *Gevas,* the court ordered a sanity and fitness evaluation of defendant. The doctor who examined defendant pursuant to this court order initially could not reach an opinion, because of defendant's lack of cooperation, but later found defendant legally sane and fit to stand trial. Defense counsel failed to advise the trial court of the opinion of another doctor, a psychiatrist who had examined defendant before defendant pleaded guilty. This doctor was of the opinion that, at the time of the crimes, defendant was sane but of questionable fitness to assist in his defense. Post trial, defendant filed a *pro se* motion for execution of death sentence and to eliminate all appeals. His counsel filed a post-trial motion to withdraw the guilty plea, *inter alia,* and presented the affidavit of the psychiatrist in whose opinion the defendant was unfit to assist in his defense. The affidavit noted that defendant was being treated with Thorazine, and other antipsychotic and antidepressant medications, on certain dates prior to the time defendant entered his plea and was sentenced.

In denying the post-trial motion, the trial court in *Gevas* stated its belief that a fitness hearing previously had been held. The trial court added its opinion, based on personal observation, that defendant knew what was happening in the courtroom. On appeal, we reversed defendant's convictions and sentence and remanded for new trial. We observed that, although the record did not establish that defendant was taking the medications on the exact dates he pleaded guilty and was sentenced, the last date on which defendant was shown to have been taking the drugs was "proximate enough to the dates defendant pleaded guilty and was sentenced to have imposed a duty on the trial court to further investigate defendant's fitness for trial." (*Gevas,* 166 Ill. 2d at 469.) We also noted that the trial court was mistaken in its belief that a fitness hearing had been

held, as a fitness evaluation by a doctor is not the same as a formal fitness hearing.

In the case at bar, no fitness hearing of any kind was held and it does not appear that defense counsel requested a psychological evaluation for the specific purpose of ascertaining defendant's fitness to stand trial. At the sentencing stage, some information regarding defendant's medication was available, along with his history of suicide attempts, self-mutilation, and psychiatric treatment. Neither defense counsel nor the court considered or inquired into defendant's use of psychotropic medication and its possible effect on his mental cognition, mood, or demeanor. As was the case in *Brandon* and *Gevas*, it appears that the relationship between the defendant's use of psychotropic medications and the existence of a *bona fide* doubt of his fitness was not fully realized at the trial level.

Our precedent has now established that the administration of psychotropic drugs to persons accused of crimes is a strong signal that the fitness of such accused is in issue; if the requisites of section 104—21(a) are satisfied, the defendant is entitled to a fitness hearing as a matter of right. In the instant case, the reference to defendant's psychotropic medication in the presentencing report placed the attorneys and the circuit court on notice that defendant's fitness was at least arguably in issue during the time of his plea bargaining and sentencing. However, unlike the situation presented in *Brandon* and *Gevas*, in the case at bar we do not have an adequate record upon which to evaluate whether defendant's receipt of psychotropic drugs while in jail was medically significant. We cannot determine whether the administration of the Thorazine was proximate enough in time to defendant's guilty plea and sentencing to trigger the right to a full fitness hearing pursuant to section 104—21(a). We cannot reliably ascertain from the

instant record when defendant began to take Thorazine, the amount prescribed, the medical reasons it was prescribed for him, or in what manner the drug might have influenced defendant's mental functioning, mood, and demeanor in the courtroom. Further inquiry into the specifics of defendant's drug usage at the time of his sentencing would have provided the trial court with facts relevant to whether the court had a further duty, under section 104—21(a), to conduct a formal fitness hearing. See *Gevas*, 166 Ill. 2d at 469-70.

Because no such inquiry was made, this court cannot now determine whether defense counsel's failure to request a fitness hearing under section 104—21(a) and the court's failure to hold such hearing denied defendant due process of law. If we were to affirm defendant's convictions and death penalty without considering the possibility that psychotropic medication might have deprived him of his competence, we would risk tilting the balance toward finality of judgment at the expense of fundamental fairness. However, if we were to vacate the guilty plea and death sentence and remand for new trial, as we did in *Brandon* and *Gevas*, without the circumstances present in those cases, we would be creating an unjustified burden upon the State's resources, in forcing reprosecution of a defendant whose right to a full competency hearing is not established in the record. We conclude that a limited remand for clarification of the circumstances surrounding defendant's use of psychotropic medications strikes the proper balance in the case at bar.

Defendant contends that other factors in addition to his use of psychotropic medication gave rise to the trial court's duty to hold a fitness hearing, *i.e.*, defendant's sudden decision to seek the death penalty after he had been cooperating with counsel and pursuing the plea agreement under which his life would be spared. Defen-

dant argues that the choice of death raises a *bona fide* doubt as to his mental fitness at the time of his plea, especially in light of his history of mental health problems and self-destructive behaviors.

We need not determine, in the abstract, whether a defendant who pleads guilty with the hope or expectation of receiving the death penalty should be automatically viewed as lacking the mental competence to make such decision. (See, *e.g.*, *Rees v. Peyton* (1966), 384 U.S. 312, 16 L. Ed. 2d 583, 86 S. Ct. 1505; *Felde v. Blackburn* (5th Cir. 1986), 795 F.2d 400.) While a defendant's choice of the death penalty may raise a question of his or her competence, in a particular case, we believe that it is a factor for the circuit court to consider in the context of the specific circumstances presented. Here, the record indicates that defendant twice attempted suicide and has a history of harming himself. Dr. Day testified that defendant's destructive conduct was indicative of low self-esteem and a desire for punishment. Defendant's request for the death penalty might be viewed as a plea for State-assisted suicide, and we do not believe that Illinois trial courts and juries should be put in the position of granting such requests as a matter of a defendant's stated preference. Defendant's selection of execution following his counsel's successful negotiation of a plea agreement for a term of years should not necessarily have been accepted as a rational decision under the circumstances. In *Gevas*, the defendant also requested the court to impose the death penalty, expressing the desire to " 'get this over with as soon as possible.' " We commented that it was "unknown to what extent defendant's treatment with these [psychotropic] drugs affected his unwillingness to present a defense, and this issue could have been resolved at a fitness hearing." (*Gevas*, 166 Ill. 2d at 471.) Similarly, in the instant case we do not know the extent to which the drugs or

other factors might have affected defendant's request for the death penalty.

In light of the importance the legislature has placed on the right of an accused taking psychotropic medication to receive a fitness hearing under section 104—21(a), and in accordance with the rationale underlying our recent precedent, we hold that a limited remand is necessary. We do not at this time vacate defendant's plea of guilty or hold that he should have been given a fitness hearing before he entered the plea and was sentenced. Instead, we retain jurisdiction over this appeal and order the circuit court to conduct an inquiry into the factual circumstances surrounding defendant's asserted use of psychotropic medication while in prison. These circumstances include the dates on which he received and ingested such medicine and whether the psychotropic drug treatment is linked closely enough to the time of defendant's plea of guilty and sentencing to have entitled him to a competency hearing pursuant to section 104—21(a).

After holding this factual inquiry into defendant's use of psychotropic medication, the circuit court shall report its findings to the clerk of this court within 60 days of this decision, accompanied by a record of the proceedings on remand.

In the exercise of this court's supervisory authority, we order a remand of this cause, in accordance with the foregoing directions, to the circuit court of Mason County for further proceedings.

*Cause remanded with directions;*
*jurisdiction retained.*

JUSTICE MILLER, dissenting:

I do not agree with the majority's conclusion that the defendant is entitled to have the present case remanded to the circuit court for the hearing required by today's decision.

This case raises once more questions previously considered in *People v. Gevas* (1995), 166 Ill. 2d 461, and *People v. Brandon* (1994), 162 Ill. 2d 450, regarding the operation of section 104—21(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—21(a) (West 1992)). Section 104—21(a) provides that a defendant using psychotropic drugs is "entitled" to a fitness hearing. The defendant in the present case entered an open plea to charges of first degree murder, armed robbery, residential burglary, and home invasion and, following a capital sentencing hearing, was sentenced to death for the murder conviction. On appeal the defendant argues, among other issues, that he was entitled to a fitness hearing under section 104—21(a) because he had been taking the antipsychotic drug Thorazine around the time he entered his guilty plea. No issue regarding the defendant's fitness was ever raised in the trial court, however, and so the defendant presses the related contention that defense counsel was ineffective in failing to request a fitness hearing pursuant to section 104—21(a).

As the majority opinion acknowledges, the record in this case fails to show both how much Thorazine the defendant was taking and when he was receiving it. To fill these gaps in the record, the majority proposes to remand the cause to the trial court so that the defendant can belatedly introduce evidence on this threshold issue and thus establish whether he might have been entitled to a fitness hearing under the provisions of section 104—21(a). Rather than being grounds for a limited remand, however, these missing pieces of information demonstrate to me the defendant's utter failure to make an adequate record on matters he now wishes to raise on appeal.

More fundamentally, I disagree with the majority's assertion that the legislature, through section 104—21(a), has essentially equated the use of psychotropic

drugs with the presence of a *bona fide* doubt concerning fitness. Under the fitness provisions, a trial court is required to conduct a hearing when a *bona fide* doubt exists regarding a defendant's competency. (725 ILCS 5/104—11(a) (West 1992) ("When a bona fide doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further").) Relying on *Brandon* and *Gevas*, the majority concludes that a fitness hearing is also required under section 104—21(a) if the defendant is receiving psychotropic drugs, even though the defendant fails to make a timely request for a hearing. The majority effectively imposes on trial judges the duty to make a special inquiry in every case and to conduct a fitness hearing *sua sponte* if evidence of psychotropic drug usage is found. As the result in this case illustrates, unless the trial judge takes those steps, a defendant who was receiving psychotropic drugs at some point during the circuit court proceedings may wait until appeal to raise the question of fitness under section 104—21(a). The majority's analysis, however, goes well beyond the terms of the statute.

To say that a defendant is "entitled" to a fitness hearing is much different from saying that a hearing is absolutely required in all circumstances, no matter how tardy the defendant's request might be. A defendant may be "entitled" to a fitness hearing yet still be compelled to raise the issue in a timely manner; there is no inconsistency in requiring a defendant to establish his entitlement by invoking the statute in an appropriate fashion. Under the majority's reasoning, however, the provision in question simply becomes a trump card that the defendant may play on appeal, following conviction and sentence, without regard to his failure to raise the issue properly in the trial court.

CHIEF JUSTICE BILANDIC and JUSTICE HEIPLE join in this dissent.