THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL VALLO, Defendant-Appellant.

First District (4th Division)   No. 1—99—3073

Opinion filed June 14, 2001.

Michael J. Pelletier and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Jon J. Walters, and Ash L. Sawkar, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HOFFMAN delivered the opinion of the court:

Following a jury trial, the defendant, Daniel Vallo, was found guilty of first degree murder and sentenced to 50 years in prison. On appeal, the defendant argued that he had been denied effective assistance of counsel, that the trial court abused its discretion in sentencing him, and that the case must be remanded for a hearing to examine the circumstances surrounding his use of psychotropic drugs at the time of trial. On June 20, 1997, this court issued an order addressing those claims. *People v. Vallo*, No. 1—95—1899 (1997) (unpublished order under Supreme Court Rule 23). We concluded that the defendant's claims of ineffective assistance of counsel and excessive sentence were meritless and would address those claims no further. We did, however, remand the case with directions that the trial court conduct a hearing, pursuant to *People v. Burgess*, 176 Ill. 2d 289, 680 N.E.2d 357 (1997), regarding the defendant's use of psychotropic drugs and their effect upon him, if any. We ordered that, if the trial court determined that the defendant did not take psychotropic drugs at or near the time of his trial and sentencing or that the defendant did take such drugs at the relevant time but suffered no resulting impairment, the defen-

dant's conviction and sentence would stand. We further ordered, however, that if the trial court determined that the defendant was impaired as a result of psychotropic drugs taken in proximity to his trial and sentencing, it must vacate his conviction. *People v. Vallo*, No. 1—95—1899 (1997) (unpublished order under Supreme Court Rule 23).

Pursuant to our order, the trial court conducted a hearing and concluded that the defendant did take psychotropic drugs during the relevant time frame but that he suffered no resulting impairment. The defendant now appeals the latter finding, arguing it is against the manifest weight of the evidence. He further argues that the trial court erred in denying his request for the appointment of an expert witness.

On remand, defense counsel, on February 5, 1999, filed a motion requesting, *inter alia*, that the court allow him to retain an expert witness to review the defendant's medical records with fees for said expert to be paid by the county. Defense counsel explained that he had been unable to contact either of the two psychiatrists that had treated the defendant at Cermak Hospital as neither doctor was still employed by that facility. In response to the defendant's request, the State informed the court that it intended to give the defendant's medical records to a psychiatrist at forensic clinical services for review. It asserted that this doctor would be an independent expert, rather than an expert witness for the State, because forensic clinical services is not part of the State's Attorney's office and because "that office is used for BCX's [behavioral clinical examinations] all the time in the court system here." The trial judge denied the defendant's request for the appointment of an expert witness. Instead, it ordered both the defendant and the State to attempt to locate the defendant's treating doctors. Defense counsel voiced concerns that even if the doctors were located, they would likely require compensation before speaking to him. The judge responded that the parties could issue subpoenas for the doctors and the doctors could submit fee petitions to the court.

On a subsequent status date, May 12, 1999, the parties informed the court they had located one of the psychiatrists in question but did not identify the doctor by name. The record contains a written order entered on July 28, 1999, ordering that Dr. Roxane Sanders review the defendant's medical and psychiatric records in preparation for her testimony. The order was prepared by the State but is marked as an agreed order. The record contains no transcript of proceedings for the date it was entered.

At the beginning of the August 19, 1999, hearing, the parties stipulated that jury selection for the defendant's trial took place on May 1, 1995, that the trial itself took place on May 2 and 3, 1995, and that

the defendant was sentenced on June 5, 1995. The parties further stipulated that, if called, the records custodian from Cermak Health Services would testify that the defendant's medical records state that he was administered one or two doses of Haldol and/or one or two doses of Cogentin daily from April 13, 1995, to the end of May 1995. With specific regard to the trial dates, the records showed the defendant was administered both Haldol and Cogentin at 9 a.m. and again at 9 p.m. on May 1 and 2. On May 3, he was administered Haldol at 5 p.m. and Cogentin at 9 p.m. No records were available for the month of June. The State pointed out that it was stipulating only that the records stated that the defendant had been administered these drugs, not that he actually ingested them. It questioned whether the defendant could actually have been given the drugs in question at Cermak Hospital at 9 a.m. on the dates he appeared in court for his trial. The parties further stipulated that Haldol is a psychotropic drug and that Cogentin is a drug prescribed in conjunction with Haldol to prevent some of its side effects.

After the parties presented these stipulations, the trial court made a finding that the defendant was, in fact, administered psychotropic drugs in proximity to the dates of his trial and/or sentencing. Defense counsel then objected to continuing with the hearing in light of the fact that the trial court had not allowed the defendant to retain his own expert witness. Defense counsel informed the court that, after the parties had located Dr. Sanders, he sent her a letter asking her to review the defendant's medical records. According to counsel, Dr. Sanders refused to do so without compensation. Counsel further informed the court that he had again contacted Dr. Sanders after the court issued an order requiring her to review the defendant's records but that Dr. Sanders still refused to speak to him as she could not be assured of compensation. Defense counsel informed the trial court that Dr. Sanders did, however, inform him at that time that she would have no opinion regarding the defendant's fitness. The trial judge treated defense counsel's objections to continuing with the hearing as a renewed motion for the appointment of an expert and denied the motion.

The hearing continued, with the State calling as its first witness Dr. Sanders, who, during the latter part of 1994 and early part of 1995, was a staff psychiatrist and the director of mental health services at Cermak Hospital. Dr. Sanders was qualified as an expert in the field of forensic psychiatry. She testified that she had reviewed the defendant's medical records for the time period of October 1994 through May 1995. According to Dr. Sanders, those records revealed that Dr. Vacula had prescribed, and the defendant was administered,

Haldol and Cogentin daily from November 1994 to January 1995. The doctor acknowledged that the records indicate the defendant was also administered Haldol and Cogentin on a daily basis from mid-April through the end of May 1995, but testified that she saw no prescription in the records for that time period. Dr. Sanders further testified that, according to the records, Dr. Vacula had given the defendant a diagnosis of schizophreniform disorder, a psychotic reaction that lasts longer than a couple of weeks. The records indicated he had based his diagnosis on the fact that the defendant was experiencing "a break with reality where he was hearing voices."

Haldol, the doctor testified, is an antipsychotic medication used to treat severe psychiatric symptoms or severe anxiety. Dr. Sanders testified that a typical dose of Haldol can range from one-half to 60 milligrams per day. The defendant was being administered 5 to 20 milligrams per day. Cogentin, she testified, is an anticholinergic drug used with Haldol to counteract its side effects. It is not a psychotropic drug. A typical dose of Cogentin can range from one-half milligram to six milligrams per day. The defendant was being administered doses of one or two milligrams twice daily. According to the doctor, the medical records indicate only that the defendant was administered the drugs, not that he ingested them. She testified that the records indicated the defendant sometimes refused his medication due to the side effects, stating that it made him tired and "made him feel not like himself."

Dr. Sanders testified that there are several classes of potential side effects of Haldol, the first of which includes dry mouth, constipation, blurred vision, and difficulty urinating. The drug can also produce symptoms of Parkinsonism, including tremors, a blank facial expression, stiffness, and a shuffling gait. Another class of potential effects is muscle spasms, which are generally sustained and very painful to the patient and obvious to an observer. Finally, Haldol can cause neuroleptic malignant syndrome, a life-threatening condition that requires immediate hospitalization, and tardive dyskinesia, permanent involuntary movement. According to Dr. Sanders, not everyone who takes Haldol experiences adverse effects. The doctor testified that a person taking Haldol and Cogentin could potentially exhibit signs of impairment including drowsiness, inattentiveness, and forgetfulness, losing his train of thought during the middle of a conversation, and taking longer than usual to answer questions.

Dr. Sanders testified that, according to the defendant's records, he had been discharged from the acute psychiatric unit three times, once in each of the months of January, February, and April 1995, with a diagnosis of malingering, which she defined as "intentionally producing psychiatric symptoms for some obvious or secondary gain." Ac-

cording to the defendant's records, Dr. Sanders had only personally seen him once. On April 3, 1995, she prescribed a one-time 50-milligram dose of Thorazine for the defendant in order to calm him down after he had become agitated and combative and placed in restraints. After the restraints were removed, the doctor interviewed the defendant. According to her notes, Dr. Sanders felt the defendant was exaggerating his degree of sedation during the interview. She testified that any adverse effects of the one-time dose of Thorazine would have dissipated within a day or two.

Dr. Sanders testified that, based on her review of the defendant's records, it appeared that he was competent to make decisions about his psychiatric treatment and medications. She further testified, however, that she had no opinion regarding the defendant's fitness at the time of his trial. She opined that the most important information in evaluating whether medication has an effect on a particular person is how the person appears while taking it.

The State next called the defendant's trial attorney, Mike Johnson, to testify. Johnson testified that he represented the defendant from April of 1994 through his sentencing on June 5, 1995. According to Johnson, the defendant appeared able to communicate with him during that time frame generally and specifically on the dates of trial and sentencing. The defendant never appeared as if he did not understand what Johnson was saying and answered Johnson's questions appropriately. Johnson did not recall ever seeing the defendant having muscle spasms, nervous tics, or tremors or exhibiting any signs of physical illness. Johnson testified that the defendant appeared to be alert during trial. When asked if the defendant was inattentive during trial, Johnson responded "[t]he only inattentiveness would be maybe during my examination of him on the witness stand, there appeared to be some problem during my examination." When asked if the defendant had ever appeared unable to cooperate, Johnson answered: "Again the only time was parts of his testimony. Other than that, he was cooperative."

On cross-examination, Johnson acknowledged that he sought an order, dated March 3, 1995, transferring the defendant to Cermak Hospital for observation and treatment because he "was dozing or very sleepy." Defense counsel then gave Johnson a transcript of the defendant's trial testimony and questioned him extensively regarding the defendant's answers or lack thereof to numerous questions. According to Johnson, the defendant's answers to some of his questions were nonresponsive or not appropriate. The defendant's testimony for approximately the first 10 pages of the trial transcript was "mostly not" in keeping with how Johnson had prepared him. Johnson had to

instruct the defendant to speak up on a number of occasions because his answers were not audible. Johnson testified that it was his trial strategy to present evidence of self-defense or provocation in an effort to get a second degree murder jury instruction or an acquittal. Accordingly, it was very important for the defendant to explain the circumstances under which he felt provoked by the victim. The defendant, however, failed to respond to a number of questions regarding when and how many times the victim had threatened him. Johnson further testified that, at one point during the direct examination, the defendant turned around in his chair. Johnson did not know the defendant was on medication at the time. When questioned by the court, however, Johnson testified that there was nothing during the trial or the sentencing hearing that led him to believe that the defendant was unable to understand the proceedings, to cooperate with Johnson, or to assist in his own defense.

The State's final witness was Anthony Gray, a mental health specialist at Cermak Health Services. Gray testified that his job duty is to observe and document the behavior of patients who are receiving treatment for a psychiatric disorder. The defendant was one of the patients assigned to him in 1995. Gray testified that, in his notes of April 4, 1995, he stated that the defendant was "a convincing portrayer of psychosis" and an "unreliable reporter of symptoms and intelligence." He also noted that the defendant was "physically working himself up to cry" and noted "pseudo rapid speech."

The State then rested. The defendant, noting that he had not been permitted to retain an expert witness, rested without presenting evidence.

When announcing its findings, the trial court stated that it had considered the transcript of the defendant's trial testimony. The transcript reflects "no response" from the defendant for 19 questions asked of him on direct examination and 5 questions asked of him on cross-examination and that he nodded his head rather than responding verbally to a total of 28 questions. The record also reflects that, on three occasions, the trial court instructed the defendant to turn his chair.

At the conclusion of the hearing, the trial court stated that, although it was unclear whether psychotropic drugs had actually been prescribed for the defendant at the time of his trial and sentencing or whether he had actually taken any drugs he might have been given during that time, it would assume that the defendant was taking psychotropic drugs during the relevant time. The trial court then found, however, that the defendant was not impaired as a result of the drugs he was taking, stating that it based this conclusion on the evidence

introduced at the hearing, the transcript of the defendant's trial testimony, and its own recollection of the defendant's conduct at trial and sentencing. With regard to the defendant's testimony at trial, the court stated that a reading of the entire transcript gave "a somewhat different view" than the one defense counsel had attempted to present during Johnson's cross-examination. The court noted it was not unusual that the defendant had to be repeatedly advised to speak up as the courtroom microphone did not work or that he repeatedly nodded his head in answer to questions rather than verbalizing his answers. As to testimony that the defendant's answers to many questions were nonresponsive, the trial court stated that many of those questions were compound questions, which are often confusing to witnesses. The trial judge stated that he did recall the defendant turning his chair around at trial and that he did think that was "fairly unusual." He did not, however, find it unusual that the defendant testified in a manner inconsistent with the manner in which he had prepared his testimony with his trial attorney. The court noted that the questions asked of the defendant on direct examination were designed to bring out facts defense counsel hoped would warrant a second degree murder or self-defense instruction, both of which the trial judge stated were "somewhat abstract legal concepts *** that may not lend themselves to that much importance to a witness."

On appeal, the defendant contends that the trial court erred in failing to appoint an expert witness on his behalf. He further contends that the trial court's finding that he was not impaired as a result of the psychotropic drugs he ingested is against the manifest weight of the evidence. See *People v. Burton*, 184 Ill. 2d 1, 13, 703 N.E.2d 49 (1998) (circuit court's ruling on question of fitness reversed only if against manifest weight of evidence).

We will begin by addressing the State's assertion that, due to a change in the law that occurred during the pendency of this appeal, we should simply affirm the defendant's conviction without considering the merits of the trial court's ruling on remand. Both the explanation and the resolution of the State's argument require a brief summary of the evolution of Illinois law on the subject of the entitlement of a defendant taking psychotropic drugs at or near the time of his trial to a fitness hearing.

●1 It is well settled that it is a violation of due process to prosecute a defendant who is unfit to stand trial. *People v. Murphy*, 72 Ill. 2d 421, 430, 381 N.E.2d 677 (1978). A defendant is fit to stand trial unless a mental or physical problem renders him unable to understand the nature and purpose of the proceedings against him or to aid in his defense. 725 ILCS 5/104—10 (West 1994). While, in Illinois, a defen-

dant is presumed fit to stand trial, section 104—11(a) of the Code of Criminal Procedure of 1963 (Code) requires that the trial court conduct a fitness hearing if it determines a *bona fide* doubt as to the defendant's fitness for trial or sentencing is raised. 725 ILCS 5/104—11(a) (West 1994). Additionally, at the time of the defendant's trial, section 104—21(a) of the Code provided that a defendant taking psychotropic drugs was "entitled to a hearing on the issue of his fitness while under medication." 725 ILCS 5/104—21(a) (West 1994).[1]

In *People v. Brandon*, 162 Ill. 2d 450, 643 N.E.2d 712 (1994), and *People v. Gevas*, 166 Ill. 2d 461, 655 N.E.2d 894 (1995), the Illinois Supreme Court held that a defendant taking psychotropic drugs at or near the time of his trial and sentencing has a statutory right to a fitness hearing pursuant to section 104—21(a) and that the trial court's failure to afford him such a hearing compels reversal of the defendant's conviction and remand for further proceedings. It held that the defendant could not waive the issue by his failure to request a section 104—21(a) fitness hearing before the trial court. See *Brandon*, 162 Ill. 2d at 457; see also *People v. Kinkead*, 168 Ill. 2d 394, 406, 660 N.E.2d 852 (1995). The court implied in *Brandon* and stated in *Gevas* that the Illinois legislature had equated the ingestion of psychotropic drugs with a *bona fide* doubt as to the defendant's fitness to stand trial. *Brandon*, 162 Ill. 2d at 457; *Gevas*, 166 Ill. 2d at 469. In *People v. Nitz*, 173 Ill. 2d 151, 159-161, 670 N.E.2d 672 (1996), the court went a step further and held that the failure to afford a defendant taking psychotropic drugs a section 104—21(a) fitness hearing constitutes a violation of the defendant's due process right not to be tried while unfit.

Initially, the supreme court held that the proper course of action in a case where the defendant had been deprived of a section 104—21(a) hearing was to reverse his conviction and remand for a new trial due to the inherent difficulties of conducting a retrospective fitness hearing. See *Gevas*, 166 Ill. 2d at 471. Subsequently, in *Burgess*, 176 Ill. 2d at 303, the court departed from its prior practice of automatic reversal, observing that "there will be some circumstances in which it can be said that the use of psychotropic medication did not affect the defendant's mental functioning in such a way that relief would be ap-

---

[1]Section 104—21(a) has been amended twice since the defendant's trial and now provides that a defendant shall not be presumed unfit to stand trial solely by virtue of the fact that he is receiving psychotropic drugs. 725 ILCS 5/104—21(a) (West 1998). The current version of the statute is inapplicable to the instant case (see *People v. Cortes*, 181 Ill. 2d 249, 275 n.2 (1998)), however, and all references herein to section 104—21(a) are to the version of that section in effect at the time of the defendant's trial.

propriate." It was pursuant to the supreme court's holding in *Burgess* that we remanded the instant case for a hearing on the issue of whether the defendant was taking psychotropic drugs at or near the time of his trial and sentencing and, if so, whether he suffered any impairment as a result.

After the hearing was conducted on remand and while the instant appeal was pending, the supreme court issued yet another decision touching on the question of a defendant's entitlement to a fitness hearing pursuant to section 104—21(a). In *People v. Mitchell*, 189 Ill. 2d 312, 727 N.E.2d 254 (2000), the supreme court reconsidered and found its prior pronouncements that the legislature had equated the ingestion of psychiatric drugs with a *bona fide* doubt as to fitness and that the failure to conduct a section 104—21(a) hearing, in and of itself, constituted a due process violation to be in error. *Mitchell*, 189 Ill. 2d at 331. In doing so, the *Mitchell* court examined the language of section 104—21(a) and concluded that it does not require a trial court to *sua sponte* conduct a further inquiry when evidence of the defendant's drug use comes to its attention. *Mitchell*, 189 Ill. 2d at 333, 337 ("trial courts had no obligation to order *sua sponte* a section 104—21(a) fitness hearing if a defendant did not request one").

The defendant first asserts that *Mitchell* is inapplicable to the instant case because it pertains to a defendant's entitlement to a fitness hearing, whereas the hearing that we ordered and that the trial court conducted was confined to the issue of whether the defendant was *impaired* by any drugs he was taking. A thorough reading of our earlier order makes it clear that we remanded for a retrospective hearing as to the defendant's fitness for trial and sentencing, and the trial court conducted just such a hearing. The defendant also contends that *Mitchell* stands only for the proposition that a claim based upon a lack of a section 104—21(a) hearing cannot be raised during postconviction proceedings because it is not a claim of constitutional error and it does not affect the viability of a claim, raised on direct appeal as in the instant case, of deprivation of a defendant's statutory right to such a hearing. The defendant is correct that nothing in *Mitchell* affects the viability of a claim, raised on direct appeal, that the trial court erred in failing to conduct a section 104—21(a) fitness hearing in the face of evidence the defendant was taking psychotropic drugs if the defendant asked for such a hearing. The defendant here did not, however, request a hearing before the trial court but argued, on direct appeal, that, due to the presentence report's reference to psychotropic drugs, the trial court had a duty to investigate the matter *sua sponte*. Under the law in effect at the time of his hearing, the defendant was correct. See *Kinkead*, 168 Ill. 2d at 406. As stated above, however, the *Mitchell*

court determined that a trial court does not have a duty to *sua sponte* order a section 104—21(a) fitness hearing. Thus, the State is correct that, under *Mitchell*, the defendant was not entitled to the fitness hearing he was afforded on remand solely by virtue of the fact that his presentence report indicated he was taking psychotropic drugs. We cannot, however, agree with the State's contention that we should, therefore, pretend the hearing never took place and summarily affirm the defendant's conviction.

•2 Subsequent to *Mitchell*, a trial court does not have a duty to inquire further into the defendant's fitness when evidence that the defendant is taking psychotropic drugs, without more, has come to its attention. *Mitchell* did not, however, change, but in fact reiterated, the longstanding rule that, when a *bona fide* doubt as to the defendant's fitness is raised, the trial court must make a determination of the defendant's fitness before proceeding any further. See 725 ILCS 5/104—11(a) (West 1994); *Mitchell*, 189 Ill. 2d at 330. In the instant case, the trial court observed the defendant testify on his own behalf at trial. The transcript indicates that the defendant failed to answer numerous questions posed to him, gave some answers that were non-responsive to the questions asked, and apparently, on three occasions, turned his chair away from the attorney then questioning him. We cannot say that this in itself raised a *bona fide* doubt as to the defendant's fitness. We do, however, believe that such conduct coupled with the fact that the defendant was taking psychotropic drugs, a fact that came to the trial court's attention by way of the presentence report, did raise a *bona fide* doubt as to the defendant's fitness, thereby imposing upon the trial court a duty to conduct an inquiry into his fitness. Accordingly, despite the change of law announced in *Mitchell*, we still find that the defendant was entitled to the hearing that he was afforded on remand. Accordingly, we will address the defendant's contentions of error.

The defendant first contends that the trial court erred in refusing to appoint an expert witness on his behalf to review his medical records. The State contends the trial court properly denied the request as Dr. Sanders, one of the defendant's treating doctors, was an independent expert.

•3 With respect to this issue, both parties refer us to case law stating the general rule that an indigent defendant is entitled to payment of reasonable fees to obtain the services of an expert on an issue that is crucial to his defense. *People v. Watson*, 36 Ill. 2d 228, 233-34, 221 N.E.2d 645 (1966); *People v. Kinion*, 97 Ill. 2d 322, 336, 454 N.E.2d 625 (1983); see also 725 ILCS 5/113—3(d) (West 1998). The State contends that the defendant was not entitled to the appointment of an

expert because the issue in question, the defendant's fitness, did not pertain to the matter of guilt and, as such, is not crucial to his defense. Both the State and the defendant, however, have failed to acknowledge the existence of a statutory provision relevant to the instant situation. Section 104—13(a) of the Code provides that: "When the issue of fitness involves the defendant's mental condition, the court shall order an examination of the defendant by one or more licensed physicians, clinical psychologists, or psychiatrists chosen by the court." 725 ILCS 5/104—13(a) (West 1998). Section 104—13(e) provides:

> "Upon request by the defense and if the defendant is indigent, the court may appoint, in addition to the expert or experts chosen pursuant to subsection (a) of this Section, a qualified expert selected by the defendant to examine him and to make a report as provided in Section 104—15. Upon filing with the court of a verified statement of services rendered, the court shall enter an order on the county board to pay such expert a reasonable fee stated in the order." 725 ILCS 5/104—13(e) (West 1998).

Had the fitness hearing in the instant case been conducted prior to trial, the trial court would have been required to appoint "one or more licensed physicians, clinical psychologists, or psychiatrists" of its own choosing to examine the defendant and the defendant would have been entitled to request the appointment of an additional expert of his choice. As the hearing in the instant case was being conducted in retrospect, we believe the requirements of section 104—13 would have been properly satisfied by the appointment of one or more experts to review the defendant's medical records. The trial court did so here, appointing Dr. Sanders, a psychiatrist, to review the defendant's records and testify. Defense counsel, however, requested the appointment of an additional expert to review his records. Although section 104—13(e) states that the trial court "may" appoint such an expert, indicating it has discretion in the matter, our supreme court has referred to the provisions of section 104—13 as "mandating the appointment of at least one medical expert of the defendant's choice" (Kinion, 97 Ill. 2d at 335). Even if the appointment of an expert of the defendant's choosing is a discretionary matter, we find that the trial court abused its discretion in the instant case. On the date of the hearing, defense counsel informed the trial court that Dr. Sanders, the court-appointed expert, had refused to discuss the defendant's medical records with him due to concern that she would not be reimbursed for doing so. Furthermore, Dr. Sanders offered no opinion as to the defendant's fitness at the time of trial. We recognize the possibility that any expert witness who had not examined the defendant at the time of his trial and sentencing might decline to offer an opinion as to fitness. We

believe, however, that under the circumstances the defendant was entitled to the appointment of an expert to review his medical records, to offer an opinion, if any, as to the defendant's fitness at the relevant time, and, at the very least, to educate defense counsel in such a manner as to prepare him for cross-examination of Dr. Sanders (see *People v. Lawson*, 163 Ill. 2d 187, 229, 644 N.E.2d 1172 (1994)). We reject the State's assertion that the error, if any, was harmless because the defendant cannot identify in what respect his expert's testimony would have differed from that of Dr. Sanders. This argument is rather disingenuous. We fail to see how the defendant, having been denied the opportunity to consult an expert, can be expected to inform this court of the substance of that expert's potential testimony.

•4 For the reasons stated above, we believe the defendant was denied a fair fitness hearing on remand. Accordingly, we vacate the trial court's order finding that the defendant was not impaired by the drugs he was taking at the time of his trial. We recognize that, subsequent to its decision in *Burgess*, our supreme court, in *People v. Neal*, 179 Ill. 2d 541, 553-54, 689 N.E.2d 1040 (1997), cautioned that, after the passage of more than one year, a retrospective fitness hearing will generally be inappropriate. In *Mitchell*, however, the supreme court acknowledged that retrospective hearings have become the "norm." *Mitchell*, 189 Ill. 2d at 339. Nonetheless, in an attempt to insure that a new hearing is conducted in a timely manner, we retain jurisdiction over this appeal and remand the cause to the trial court with directions that it appoint an expert witness on the defendant's behalf, conduct a new hearing as to the issue of the defendant's fitness at the time of trial and sentencing, and issue its written findings, all within 90 days of the issuance of our mandate. No later than 30 days after the the trial court issues its written findings, the State shall file with the clerk of this court a copy of those written findings, accompanied by a record of the proceedings on remand. Upon our receipt of the record to be filed by the State, we shall set a briefing schedule, allowing the defendant an opportunity to raise any issues he so chooses with respect to the proceedings on remand.

Order vacated; cause remanded with directions; jurisdiction retained.

HARTMAN, P.J., and SOUTH, J., concur.