(No. 75604

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DAVID GEVAS, Appellant.

*Opinion filed June 22, 1995.—Rehearing denied October 2, 1995.*

462

MILLER, J., joined by BILANDIC, C.J., and HEIPLE, J., dissenting.

Theodore A. Gottfried, State Appellate Defender, and Timothy M. Gabrielsen, Assistant Defender, of Springfield, for appellant.

Roland W. Burris and James Ryan, Attorneys General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Sang Won Shim, Assistant State's Attorneys, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

David Gevas, defendant, pleaded guilty in the circuit court of Cook County to the murder of his two nine-month-old children and, after a hearing, the trial court sentenced him to death. Defense counsel thereafter filed several post-trial motions to vacate defendant's guilty plea, sentence defendant to natural life imprisonment, and conduct a new sentencing hearing. Defense counsel also asked the court to hold a fitness hearing based upon a letter from a psychiatrist which indicated, *inter alia,* that defendant had been treated with psychotropic drugs during the proceedings. The trial court denied these motions and request. Defendant appeals directly to this court pursuant to Supreme Court Rule 603 (134 Ill. 2d R. 603).

## BACKGROUND

On October 6, 1992, Officer Frank Lara of the Village of Riverside responded to a call of possible child abuse. Upon arriving at the hospital, Officer Lara observed bruises on the victims, John and Jessica Gevas, defendant's nine-month-old twins. Defendant denied any abuse of the children.

On October 7, 1992, after being given *Miranda* warnings, defendant informed Officer Lara that on October 6, 1992, he was baby-sitting John and Jessica. The children began crying and screaming and defendant could not calm them. Defendant picked up the children, one in each arm, and walked towards his bedroom. When defendant reached the bedroom, he threw both of the children at the bed. However, the children did not land on the bed. One of the children hit a desk that was on the opposite side of the bed and the other hit a wall. Defendant had thrown the children approximately $11^{1}/_{2}$ feet. The children later died at the hospital from the injuries sustained.

Defendant was charged by information on October 16, 1992, with six counts of first degree murder (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)), and the public defender's office was appointed to represent defendant. The State later nol-prossed the two counts under section 9—1(a)(3) of the Criminal Code of 1961, murder while committing a forcible felony, aggravated battery.

On December 8, 1992, defense counsel requested a sanity evaluation of defendant and the trial court ordered a fitness and sanity evaluation. On January 5, 1993, Dr. Mathew S. Markos of the Psychiatric Institute of the circuit court of Cook County informed the trial court that he was unable to render an opinion as to defendant's fitness to stand trial, his mental state at the time of the alleged offense, and his ability to understand *Miranda* warnings. Defendant was not cooperative,

provided very little information about the offense, and refused to sign consent forms for release of information from other facilities.

The trial court informed defendant that the case could not proceed until he cooperated with Dr. Markos. Later that month, on January 29, 1993, Dr. Markos again examined defendant. Dr. Markos found defendant fit to stand trial and legally sane at the time of the offenses. Dr. Markos also found that defendant had a satisfactory understanding of the *Miranda* warnings and the capacity to knowingly and intelligently waive his constitutional rights.

On February 2, 1993, the trial court informed defendant that because of the evidence in the case, namely the two deaths, the court could only sentence defendant to either natural life in prison or death. Defendant informed the court that he did not want to receive natural life and asked for the death penalty. Defendant was anxious to know if the State would seek the death penalty so that he could decide whether to plead guilty.

On February 16, 1993, defendant appeared in open court and stated his desire to plead guilty. The State had decided to seek the death penalty. After the court admonished defendant of his rights, defendant pleaded guilty to the charges. After consulting with his defense counsel, defendant then waived his right to a jury for sentencing. Defendant informed the court of his desire to receive the death penalty and to "get this over with as soon as possible." The court set the sentencing hearing for March 16, 1993.

A presentence investigation report was filed with the court which indicated that defendant had no previous criminal history. Defendant indicated in the report that he had dropped out of high school, earned his GED, and enrolled in college, but did not complete his degree. Defendant refused to provide any other information for the report.

On March 16, 1993, the court again took defendant's guilty plea because there had been no previous stipulation to the facts. The hearing then proceeded to sentencing. The court first noted that defendant was eligible for the death penalty because he had pleaded guilty to two murders and was over the age of 18 at the time of the murders. After this, the State presented evidence in aggravation, which included: (1) portions of defendant's wife's grand jury testimony which indicated that defendant had previously abused the children, (2) evidence that defendant was not concerned with the children, (3) evidence that defendant was unemployed while his wife worked, and (4) evidence that defendant spent his days at home smoking cocaine. The State also argued that defendant showed no remorse throughout the proceedings.

Defense counsel called no witnesses, but introduced in mitigation hospital reports detailing defendant's mental history of chronic depression and a borderline personality disorder. Also included was a March 7, 1993, summary of the hospital reports by Dr. Henry Conroe, a psychiatrist. These reports indicated that defendant, who was 27 at the time of the offenses, had been hospitalized three times as a teenager for these problems. Defense counsel further argued: (1) defendant's mental illness was exaggerated by his use of cocaine; (2) defendant had no history of criminality; and (3) there was no evidence that defendant had misbehaved in jail.

The trial court, in sentencing defendant, noted that Dr. Markos found defendant fit to stand trial. The court also noted that he did not think defendant "[gave] a damn" about the fact that the children were dead. The trial court sentenced defendant to death.

On April 14, 1993, defense counsel filed three motions: (1) a motion to withdraw defendant's guilty plea, (2) a motion to vacate defendant's death sentence and to

impose a life sentence, and (3) a motion for a new death penalty hearing. In these motions, defense counsel noted that in addition to having Dr. Markos examine defendant, defendant had also been examined prior to his guilty plea and sentencing by a private psychiatrist, Dr. Conroe. Dr. Conroe believed that defendant was sane, but was of questionable ability to assist in his defense, thereby rendering him unfit for trial. However, defense counsel noted in these motions that he deferred to Dr. Markos' determination of fitness and had not informed the trial court of Dr. Conroe's findings because he believed the chance of a finding of unfitness was small and because "counsel felt that any kind of fitness hearing would make defendant even less cooperative." Defense counsel also deferred to Dr. Markos' opinion because counsel was aware that the trial judge had not previously imposed the death penalty, even in what defense counsel believed to be more egregious cases. Counsel thus did not previously seek a fitness hearing due to his belief that the trial court would not impose the death penalty.

Defendant filed a *pro se* motion for execution of death sentence. In this motion, defendant asked the court to eliminate all appeals and stays of execution.

At the hearing on defendant's motions on May 28, 1993, defense counsel presented an affidavit along with a letter dated April 24, 1993, from Dr. Conroe. Defense counsel's affidavit stated that Dr. Conroe would be willing to testify as to the contents of the letter. Dr. Conroe's letter indicated, *inter alia*, that he had seen defendant on November 25, 1992, and January 13, 1993. On November 25, 1992, defendant was being treated with Thorazine, an antipsychotic medication, and Doxepin, an antidepressant medication. On January 13, 1993, defendant was being treated with Mellaril, an antipsychotic medication, and Zoloft, an antidepressant medica-

tion. Defense counsel argued that the court should order a fitness hearing. The trial court thought that a fitness hearing had already been held and thus found Dr. Conroe's evaluation not relevant at that point. The court also noted that it had viewed defendant many times and that defendant knew what was happening in the courtroom. The trial court denied these motions.

## ANALYSIS

Defendant raises as four issues on appeal whether: (1) the trial court erred in not ordering a fitness hearing; (2) testimony in violation of the marital privilege was improperly introduced at the death sentencing hearing; (3) Illinois' death penalty statute is violative of the eighth and fourteenth amendments because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation; and (4) Illinois' death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. Because we find defendant's argument concerning the trial court's failure to conduct a fitness hearing dispositive, we do not discuss the other issues.

Defendant argues that the trial court should have held a fitness hearing because defense counsel brought to the trial court's attention: (1) Dr. Conroe's finding that defendant was unfit to stand trial; (2) Dr. Conroe's indication of defendant's treatment with the antipsychotic drug Thorazine and the antidepressant drug Doxepin on November 25, 1992, and the antipsychotic drug Mellaril and the antidepressant drug Zoloft on January 13, 1993; (3) defendant's transfer to a medical unit while incarcerated; and (4) defendant's refusal to eat or drink for five days.

We find the fact that the trial court was informed of defendant's treatment with psychotropic drugs during the proceedings, but refused to investigate further by

holding a fitness hearing, warrants a reversal of defendant's convictions and sentence. This court recently noted in *People v. Brandon* (1994), 162 Ill. 2d 450:

"The due process clause of the fourteenth amendment (U.S. Const., amend. XIV) prohibits the prosecution of a person who is unfit to stand trial. (*Medina v. California* (1992), 505 U.S. 437, 439, 120 L. Ed. 2d 353, 359, 112 S. Ct. 2572, 2574.) Accordingly, this court has long held that the failure to observe procedures adequate to protect a defendant's right not to be tried while unfit deprives him of his due process rights to a fair trial. *People v. Murphy* (1978), 72 Ill. 2d 421, 430.

The law presumes that a defendant is fit to stand trial, plead, and be sentenced. A defendant is considered unfit to stand trial if, because of a mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. 725 ILCS 5/104—10 (West 1992); *People v. Eddmonds* (1991), 143 Ill. 2d 501, 512." *Brandon*, 162 Ill. 2d at 455-56.

The legislature has enacted laws designed to protect a defendant's right not to be tried while unfit. Section 104—11(a) of the Code of Criminal Procedure of 1963 provides:

"The issue of the defendant's fitness for trial, to plead, or to be sentenced may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial." (725 ILCS 5/104—11(a) (West 1992).)

Section 104—21(a) of the Code provides:

"A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." 725 ILCS 5/104—21(a) (West 1992).

In *Brandon*, this court held that a defendant receiving psychotropic medication must be granted a fitness hearing if his attorney requests one. (*Brandon*, 162 Ill. 2d at 456-57.) This court noted:

"Section 104—21(a) (725 ILCS 5/104—21(a) (West 1992)) evinces a recognition by the General Assembly that psychotropic medication is an important signal that a defen-

dant may not be competent to stand trial." (*Brandon*, 162 Ill. 2d at 457.)

Here, defense counsel requested a fitness hearing and presented evidence that defendant was being treated with psychotropic medication during the proceedings as late as January 13, 1993.

While the record does not reveal whether defendant was taking psychotropic medication on February 16, 1993, when he pleaded guilty and requested the death penalty, or on March 16, 1993, when he again pleaded guilty and was sentenced, this court noted in *Brandon*:

> "Because of the fundamental constitutional nature of the fitness requirement, once facts are brought to the attention of the trial court, either from observation of the defendant or by suggestion of counsel, which raise a *bona fide* doubt of the defendant's fitness to stand trial, the court has a duty to hold a fitness hearing. [Citations.]" (*Brandon*, 162 Ill. 2d at 456.)

The legislature has equated the administering of psychotropic medication to a defendant with a *bona fide* doubt as to fitness to stand trial. (*See Brandon*, 162 Ill. 2d at 457; 725 ILCS 5/104—21(a) (West 1992).) We find January 13, 1993, the last date the record reveals defendant was taking psychotropic medication, proximate enough to the dates defendant pleaded guilty and was sentenced to have imposed a duty on the trial court to further investigate defendant's fitness for trial. In finding such, we note that defendant may in fact have been treated with psychotropic medication beyond January 13, 1993.

Moreover, contrary to the trial court's finding, defendant had not already received a fitness hearing. While Dr. Markos examined defendant and found him fit to stand trial, this was not a fitness hearing. See *Brandon*, 162 Ill. 2d at 453-55 (although a psychological and neuro-psychological report was prepared and a hearing was held to determine whether a *bona fide* doubt as

to defendant's fitness existed, this did not constitute a fitness hearing).

We further note that the legislature's concern with the treatment of a defendant with psychotropic drugs is substantial. Not only does the administering of these drugs signal that a defendant may not be competent to stand trial, these drugs also have severe side effects which can affect a defendant during criminal proceedings. As Justice Kennedy noted in *Riggins v. Nevada* (1992), 504 U.S. 127, 118 L. Ed. 2d 479, 112 S. Ct. 1810:

> "Antipsychotic drugs such as Mellaril can have a 'sedation-like effect' that in severe cases may affect thought processes. ***
> ***
> As any trial attorney will attest, serious prejudice could result if medication inhibits the defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, and his future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies." (*Riggins*, 504 U.S. at 143-44, 118 L. Ed. 2d at 494-95, 112 S. Ct. at 1819-20 (Kennedy, J., concurring).)

In the instant case, the prosecutor specifically argued that defendant showed no remorse for his crimes, and the trial judge specifically noted in imposing sentence that he did not believe defendant cared that his children were dead. It is unknown to what extent the psychotropic medication defendant was taking affected his apparent lack of remorse during the proceedings. This issue could have been determined at a fitness hearing.

Justice Kennedy further noted in *Riggins*:

> "The side effects of antipsychotic drugs can hamper the attorney-client relation, *** rendering the defendant less able or willing to take part in his defense. *** ('[T]he

chemical flattening of a person's will can also lead to the defendant's loss of self-determination undermining the desire for self-preservation which is necessary to engage the defendant in his own defense in preparation for his trial')." (*Riggins*, 504 U.S. at 144, 118 L. Ed. 2d at 495, 112 S. Ct. at 1820 (Kennedy, J., concurring).)

Here, defendant was unwilling to present a defense, informing the court of his desire to receive the death penalty and "get this over with as soon as possible." Again, it is unknown to what extent defendant's treatment with these drugs affected his unwillingness to present a defense, and this issue could have been resolved at a fitness hearing.

The State's only argument pertinent to this issue is that no corroborating evidence exists to support defendant's claim that he was treated with psychotropic medication during the proceedings. The State argues that Dr. Conroe's letter detailing the different types of psychotropic medication defendant received and the dates he received them, along with defense counsel's affidavit that the doctor would testify to such at a fitness hearing, is unsubstantial. We disagree.

We conclude by noting that more than two years have passed since the trial court denied defense counsel's request for a fitness hearing. As the United States Supreme Court noted in *Drope v. Missouri* (1975), 420 U.S. 162, 183, 43 L. Ed. 2d 103, 119-20, 95 S. Ct. 896, 909, there are "inherent difficulties" in attempting a retrospective "*nunc pro tunc* determination" of defendant's mental competency even "under the most favorable circumstances." We believe that after two years it would be impossible to conduct a meaningful hearing as to defendant's fitness at the time of trial and sentencing. We therefore order, as in *Brandon*, that defendant's conviction and sentence are reversed and the cause is remanded for the State to be given the opportunity to again prosecute defendant for these crimes. In doing so,

we note that relatively few judicial resources have been devoted to this cause, as defendant pleaded guilty and the sentencing hearing was very brief.

Accordingly, the judgment of the circuit court of Cook County is reversed and the cause is remanded.

*Reversed and remanded.*

JUSTICE MILLER, dissenting:

Relying on *People v. Brandon* (1994), 162 Ill. 2d 450, and section 104—21(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—21(a) (West 1992)), the majority finds reversible error in the trial judge's failure to conduct a fitness hearing in this case. Defense counsel requested the hearing after the defendant pleaded guilty to the murder of his two children and was sentenced to death for those offenses. In support of its holding, the majority notes that after sentencing, counsel informed the judge that, according to a psychiatrist's report, the defendant had been receiving several different psychotropic drugs prior to his guilty plea. The majority believes that a hearing was therefore necessary under section 104—21(a), which provides, "A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." (725 ILCS 5/104—21(a) (West 1992).) I do not agree with the majority that a fitness hearing was required in these circumstances, and therefore I dissent.

Today's result rewards defense counsel's admitted strategy of waiting until the unfavorable outcome of the sentencing hearing was known before requesting a fitness hearing. Defense counsel's request for the hearing came some time after the defendant pleaded guilty to the murder of his two children and was sentenced to death for those offenses. In moving to withdraw the defendant's guilty plea on the ground that the defen-

dant was unfit, defense counsel candidly told the trial judge:

"If I may proceed first as to my motion to withdraw the defendant's guilty plea. The motion is self-explanatory. There was some doubt about Mr. Gevas's ability to cooperate with counsel. As I stated in my motion, I felt that the appropriate thing to do is to try to resolve the case because Mr. Gevas so desperately insisted on his case being resolved.

As I put in my motion, pages 9 and 10, I was aware of some egregious murder cases you had heard and not imposed the death penalty. I decided not to proceed with the fitness hearing because of my strong belief that the death sentence would not be imposed because of my own—I don't know what to call it, misconception of that.

THE COURT: I believe you call it trial strategy, not misconception, trial strategy."

As the trial judge understood, defense counsel's failure to request a hearing was a matter of trial strategy. While section 104—21(a) declares that a defendant receiving psychotropic drugs is entitled to a fitness hearing, the statute does not establish a defendant's incompetency, say that a hearing must be held if the defendant refuses one, or excuse counsel's failure to request a hearing in a timely manner. To be sure, an unfit defendant may not knowingly or intelligently choose to forgo a fitness hearing. (*Pate v. Robinson* (1966), 383 U.S. 375, 384, 15 L. Ed. 2d 815, 821, 86 S. Ct. 836, 841.) The trial judge in this case, however, was warranted in concluding that the defendant was fit and was justified in refusing counsel's untimely request for a hearing. The trial judge had observed the defendant in the courtroom and had spoken with him during the plea proceedings. In addition, the trial judge had the benefit of an earlier psychiatric report, which failed to raise any doubt of the defendant's competency. The defendant was examined by a separate psychiatrist pursuant to court order on January 29, 1993, shortly before he entered his guilty

plea, and was found to be fit and sane at that time. The defendant wanted the case resolved, and counsel initially concurred in that decision. Counsel changed his mind, however, once the defendant was sentenced to death.

As the majority opinion acknowledges, the record does not even disclose whether the defendant was still taking any psychotropic drugs at the time of the plea hearings. Despite the report of January 29, 1993, which found the defendant both fit and sane, the majority concludes that the last date on which the defendant was reportedly receiving the drugs, January 13, 1993, was close enough in time to the plea hearings in February and March 1993 to have entitled the defendant to a fitness hearing when counsel later requested one. (166 Ill. 2d at 469.) If, as the majority insists, section 104—21(a) is to be applied to this case, then the proper course would be to remand for an evidentiary hearing to determine whether the defendant was still receiving drugs at the time of the plea hearing. To hold otherwise, as the majority does, seemingly establishes a presumption that prior treatment will automatically qualify a defendant for a hearing under section 104—21(a).

For the reasons stated, I do not agree with the majority's conclusion that the trial court erred in refusing the defendant's request for a fitness hearing. I would consider the remaining issues raised by the defendant in the present appeal.

CHIEF JUSTICE BILANDIC and JUSTICE HEIPLE join in this dissent.