No. 2--96--0016

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

__________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of Kane County.

)

Plaintiff-Appellee, ) 

) No. 94--CF--800    

v. )     

)

JEFFREY M. FLYNN, ) Honorable

) Barry E. Puklin,

Defendant-Appellant. ) Judge, Presiding.

___________________________________________________________________

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Jeffrey Flynn, was charged with one count each of home invasion (720 ILCS 5/12--11 (West 1994)), residential burglary (720 ILCS 5/19--3(a) (West 1994)), and robbery (720 ILCS 5/18--1(a) (West 1994)) stemming from an incident on May 11, 1994, where Charles Loftus and Roger Schroeder (the complainants) encountered him in the bedroom of their apartment.  The trial court directed a verdict as to the home invasion charge.  The jury found defendant guilty of residential burglary and robbery.  The trial court sentenced defendant to a term of 15 years' incarceration.  Defendant now appeals his conviction.  We affirm.

BACKGROUND

Defendant was indicted on May 24, 1994.  On August 5, 1994, the trial court received a psychological consultation report about defendant from the Kane County Diagnostic Center.  The report concluded that he was fit to stand trial, documented his diagnosis of paranoid type schizophrenia, and described his use of psychotropic medication.  Immediately before trial began on January 23, 1995, defense counsel informed the trial court that defendant "is competent synthetically.  He has Thorazine prescribed for him.  The medicine *** has been revised to Stelazine."  

At trial, Charles Loftus, the residential burglary complainant, testified that in May 1994 he lived in an apartment maintained by the Association for Individual Development (AID).  He explained that he lived with Roger, whose last name Loftus could not recall, and Gary Scheckter.  Loftus and Roger shared a bedroom in the apartment.  Sometime early on the morning of May 11, 1994, he awoke suddenly and saw defendant, wearing "a cap and an overcoat," standing in the bedroom.  Loftus turned on the light in the bedroom after he awoke.  After he saw defendant, defendant went over to Roger's bed and "wrestled with him."  At that point, Loftus saw defendant reach into Roger's pocket.  He thought defendant "pulled out money."  While Loftus did not see anything in defendant's hand, he "heard" that defendant had taken $14.  After the struggle with Roger ended, defendant left the apartment.  Later that morning, Loftus identified defendant's picture in a photographic lineup.  Loftus identified the defendant in court as the person he saw when he awoke on the morning of May 11, 1994. 

On cross-examination, Loftus admitted that he told investigating officers that when he awoke he saw a "man in the closet."  However, Loftus testified at trial that the man in his bedroom "didn't touch the closet."  He further explained that when he turned on the light in the bedroom Roger was awake.  The man he saw in the bedroom on May 11 wore a dark brown "20's style" cap and a black knee-length overcoat.  Loftus thought that the man hit Roger in the stomach during their bedroom struggle.

Roger Schroeder, the robbery complainant, testified that in May 1994 he lived with Charles Loftus and Gary Scheckter.  On the morning of May 11, 1994, Schroeder heard his bedroom door open and a man entered his room and looked in the closet.  The man then approached Schroeder and asked him, "Do you have any money[?]"  The man held Schroeder down on his bed and Schroeder gave him 16 cents.  The intruder put the money in his pocket and then left the room.  At the time of the occurrence, the bedroom light was not on but the room was "fairly well lit" by a light from the parking lot.  When asked by the prosecutor, Schroeder was unable to identify defendant in court as the intruder.

On cross-examination, Schroeder explained that on May 10 he went to bed at about 11 p.m. and the intruder arrived sometime between 2:30 a.m. and 4 a.m. on May 11.  According to Schroeder, the intruder carried a knife.  Schroeder observed the intruder "going through" some pants in the closet.  Schroeder stated that, at the time he was struggling with the intruder, Loftus was asleep.  Schroeder denied that the intruder struck him in the stomach.  According to Schroeder, the intruder was "wearing a tan corduroy coat with a *** brown fur collar" and was not wearing a hat.  On redirect examination, Schroeder denied telling police officers that the intruder had stolen between $14 and $20.

Marja Huzevka testified that she is the clinical coordinator at AID.  She is Loftus' counselor and meets with him once per week to work on his socialization skills, which were impaired by his long institutionalization.  Huzevka also used to visit with Schroeder once per month until his departure from the AID program.  Loftus and Schroeder used to share a bedroom at the AID facility, where they were taught self-care, housekeeping, money management, community integration, and social skills that they had lost during their illnesses.  According to Huzevka, the only way that defendant would have had the authority to be inside the building would be if the complainants had consented to his presence.  On cross-examination, Huzevka admitted that, based on her experience with Loftus, he demonstrates "some confusion at times about time periods."  She also explained that she had been present for a conversation between Loftus and an assistant State's Attorney wherein Loftus stated that defendant had previously been in the apartment earlier on the night in question.  On redirect examination, Huzevka stated that Loftus is "very specific about relating information *** about events."

Sergeant Nicholas Cornado of the Aurora police department testified that on the morning of May 11, 1994, he met with Loftus, Schroeder, and Huzevka because Loftus and Schroeder were signing complaints against defendant.  Sergeant Cornado interviewed Loftus and Schroeder separately.  Both complainants were shown photographic lineups; while Loftus identified defendant in a photograph, Schroeder was unable to make a positive identification.   During his interview, Schroeder described the intruder as a black male, but, because it was dark and he was not wearing his glasses at the time, Schroeder was unable to describe the intruder's height and weight.  Schroeder told Sergeant Cornado that the intruder asked him for money while he was in bed.  The intruder then "rummaged through the bedroom closet."  After Loftus turned on the bedroom light, the intruder held down Schroeder, reached into his pocket, and removed some money.  Schroeder told Sergeant Cornado that the intruder had removed $16 from his pocket.  Sergeant Cornado did not recall Schroeder saying anything about the intruder carrying a knife.  On cross-examination, Sergeant Cornado stated that Loftus explained that he did not know the intruder, but he told the police defendant's name because it was given to him by a caseworker.

Officer Nancy Joan Stefanski of the Aurora police department testified that she responded to the complainants' residence at 2:50 a.m. on May 11, 1994.  Once there, Schroeder told her that an intruder had taken close to $20 from him.

Jayarama Naidu, a psychiatrist, treated both Loftus and Schroeder.  The first time Loftus was evaluated, approximately one year before trial, he suffered from "major depression" and "borderline intellectual functioning."  Loftus' depression consisted of "feeling down in the dumps," having no energy, not being able to concentrate, and not being able to take care of himself.  Through the use of medication, Loftus stabilized his depression.  His medications do not have side effects which would diminish his ability to perceive events around him or truthfully relate those events.  Loftus' borderline intellectual functioning indicates that "his average IQ seems to be around high 70's and low 80's."  As such, he can neither process data quickly nor engage in intelligent conversations.  His condition, however, does not impact his ability to perceive and understand events.  His memory and truthfulness are also unaffected by his condition.  According to Dr. Naidu, Loftus' conditions do not affect "the main body of his memory, but because of the anxiety he might forget minor details."  In Dr. Naidu's opinion, Loftus' perception of important events is magnified because of his anxiety and those events "make a greater impression on [his] memory."  

Dr. Naidu also evaluated Schroeder.  Schroeder experiences "dementia with Alzheimer Type."  In addition to the memory problems associated with Alzheimer's disease, Schroeder also experiences an inability to care for himself.  In May 1994, Schroeder was experiencing confusion and memory problems.  Because of his Alzheimer's disease, "he really cannot remember anything at all *** he tends to make up stories *** to fill in the gaps."  On cross-examination, Dr. Naidu further explained that Schroeder has impaired short- and long-term memory, abstract thinking, and judgment.  

On redirect examination, Dr. Naidu stated that in May 1994 Loftus had been stable for more than a year and did not experience any depressive tendencies.  Moreover, in May 1994, Loftus was not suffering from a diminished ability to concentrate, was not psychotic or demented, was not hearing voices or seeing things, and was not suffering from confabulation, a type of brain damage.

At the conclusion of Dr. Naidu's testimony, the State rested its case in chief.  The trial court granted defendant's motion for a directed verdict as to the home invasion count and denied his motion for a directed verdict as to the remaining counts.  Defendant then presented his case in chief.

Janice Lear, defendant's cousin, testified that defendant lived with her in May 1994.  On the evening of May 10, 1994, defendant was "going in and out" of Lear's apartment while she watched a series of television programs, the last of which began at 1 a.m. on May 11, 1994.  She and defendant went to sleep in the living room at approximately 1:30 a.m.  Before retiring, Lear locked the door to her apartment; defendant did not have a key to the apartment.  When she awoke later that morning, defendant was on the couch across from her.  On cross-examination, Lear admitted that she had been convicted of forgery in 1990 and retail theft and deceptive practices in 1991.  She further explained that it is a short three-minute walk from her apartment to the complainants' residence.  Finally, she admitted that, if a person unlocks her door from the inside, he does not need a key to get back in later. 

After the entry of stipulated testimony regarding the 1 a.m. program Lear watched on May 11, 1994, defendant rested his case in chief.  On January 25, 1995, the jury found defendant guilty of residential burglary and robbery.  

Nonpublishable material under Supreme Court Rule 23 omitted.

On March 3, 1995, a new attorney was appointed for defendant after he alleged that trial counsel had been ineffective.  After a hearing on December 8, 1995, the trial court denied defendant's motion for new trial based on ineffective assistance of trial counsel.  On December 29, 1995, the trial court denied defendant's posttrial motion and sentenced him to 15 years' imprisonment.  Thereafter, defendant filed this appeal.

On appeal, defendant has four contentions.  He contends that his convictions should be reversed because (1) the State failed to prove him guilty beyond a reasonable doubt of residential burglary and robbery; (2) he was not given a pretrial fitness hearing regarding his use of a psychotropic drug; (3) the jury was improperly instructed; and (4) the trial court erred in accepting the jury verdict despite juror Patricia Hoffer's inconsistent statements during polling.  We will consider defendant's contentions separately.

I

The material in this section is not to be published pursuant to Supreme Court Rule 23.
  

Nonpublishable material under Supreme Court Rule 23 omitted.

II

Defendant's second contention on appeal is that, because he was not given a pretrial fitness hearing regarding his use of a psychotropic drug, he is entitled to a new trial.  Defendant bases his contention on a line of supreme court cases which held that defendants who ingest psychotropic medication during trial and are not first given a fitness hearing are entitled to an automatic reversal of their convictions without regard to their actual condition at the time of the proceedings below.  See, 
e.g.
, 
People v. Nitz
, 173 Ill. 2d 151 (1996); 
People v. Birdsall
, 172 Ill. 2d 464 (1996); 
People v. Gevas
, 166 Ill. 2d 461 (1995); 
People v. Brandon
, 162 Ill. 2d 450 (1994).  The State argues that we should instead follow the supreme court's most recent pronouncement in 
People v. Burgess
, 176 Ill. 2d 289 (1997).  There, the court held that the "rule of automatic reversal" is not appropriate in cases where a defendant's use of psychotropic medication did not affect his mental functioning at the time of trial or sentencing.  
Burgess
, 176 Ill. 2d at 303.  Before examining the merits of defendant's contention, we believe that a brief review of the supreme court's decisions is appropriate.

A

In 
People v. Brandon
, 162 Ill. 2d 450 (1994), the supreme court considered the defendant's argument that, under section 104--21(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/104--21(a) (West 1994)), he was entitled to a fitness hearing because he had been taking psychotropic medications continuously through trial and sentencing.  
Brandon
, 162 Ill. 2d at 456.  Section 104--21(a) of the Code provides in relevant part that "[a] defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication."  725 ILCS 5/104--21(a) (West 1994).

The 
Brandon
 
court construed the plain language of section 104--21(a) and determined that, consistent with due process (see 
Medina v. California
, 505 U.S. 437, 439, 120 L. Ed. 2d 353, 359, 112 S. Ct. 2572, 2574 (1992)), defendants had the right to a fitness hearing if they were ingesting psychotropic medication at the time of proceedings below (
Brandon
, 162 Ill. 2d at 455-56).  Moreover, the 
Brandon
 court held that this matter was not committed to the discretion of the trial court; given a defendant's entitlement to a fitness hearing and an expressed decision to invoke that right, a trial court was under a duty to hold a fitness hearing.  
Brandon
, 162 Ill. 2d at 461; see 
People v. Britz
, 174 Ill. 2d 163, 195 (1996).  Thus, because he had taken psychotropic medication and had not received a fitness hearing, the defendant in 
Brandon
 was entitled to a new trial.  
Brandon
, 162 Ill. 2d at 459, 461.  Finally, the 
Brandon
 court also held that a defendant on psychotropic medication could not knowingly waive issues arising under section 104--21(a) of the Code.  Therefore, issues improperly preserved for appeal were reviewed as plain error.  
Brandon
, 162 Ill. 2d at 457-58.

The supreme court revisited section 104--21(a) in 
People v. Gevas
, 166 Ill. 2d 461 (1995), and recognized that the administration of psychotropic medication equated with a 
bona fide
 doubt as to fitness to stand trial.  
Gevas
, 166 Ill. 2d at 469-70.  In 
Gevas
, the trial court was informed of the defendant's use of psychotropic medication, but refused to conduct a fitness hearing.  As such, a reversal of the defendant's convictions and sentences was warranted.  
Gevas
, 166 Ill. 2d at 467-68.  After 
Gevas
, the supreme court consistently held that, where the evidence demonstrated that a defendant ingested psychotropic medication and did not receive a fitness hearing, he was entitled to either a remand for new trial or for a hearing to determine whether the trial court had a duty to conduct a fitness hearing.  See, 
e.g.
, 
Nitz
, 173 Ill. 2d at 164-65; 
Birdsall
, 172 Ill. 2d at 480; 
People v. Kinkead
, 168 Ill. 2d 394, 417 (1995).

B

Recently, however, in 
People v. Burgess
, 176 Ill. 2d 289 (1997), the supreme court departed from the rule of automatic reversal.  In 
Burgess
, the defendant was convicted of first degree murder and aggravated battery of a child and sentenced to death on the murder charge.  Following the submission of defendant's initial brief, the supreme court granted his motion to stay the briefing schedule and to remand the cause to the trial court for a supplementary hearing.  The purpose of the supplementary hearing was to determine whether the defendant had ingested psychotropic medication at or near the time of trial and sentencing.  The evidence adduced at the hearing demonstrated that the defendant was administered psychotropic medication throughout the course of his trial and sentencing but was not granted a fitness hearing by the trial court.  
Burgess
, 176 Ill. 2d at 298-300.

Rather than ending the inquiry at that point and automatically reversing the defendant's convictions and remanding for a new trial, which would have been consistent with 
Brandon
, the supreme court reviewed evidence of the effects of the psychotropic medication upon the defendant.  The prescribing doctor testified that, given the dosages of medication the defendant was ingesting each night, the drugs would not have had any effect on his mental condition the following day.  The jail administrator testified that he did not observe any change in the defendant's demeanor during his incarceration and medication.  A psychiatrist opined that two of the three drugs the defendant was ingesting would not have had any effect on the defendant's mental state; she did believe, however, that the defendant could have been affected by the large amount of a third psychotropic medication he was taking.  The defendant's father testified that, after his arrest and subsequent medication, the defendant became uncharacteristically hostile, disheveled, and unkempt.  Finally, the defendant's trial attorney testified that the defendant "had been able to assist him in the preparation and presentation of a defense," had "discussed all aspects of the trial with him, including 
voir dire
, the selection of defense witnesses, and the choice of questions for prosecution and defense witnesses," and had "always appeared to be alert and coherent."  
Burgess
, 176 Ill. 2d at 301-02.

At the conclusion of the supplemental hearing, the trial court entered written findings.  The trial court explained that, based on its observations, the defendant did not exhibit drowsiness, lack of memory, or inattentiveness during the trial.  Moreover, the defendant actively participated in his defense, assisted with jury selection, asked questions of the court, and communicated frequently with counsel.  
Burgess
, 176 Ill. 2d at 302.  The trial court concluded that the psychotropic medication "had no effect on the defendant's 'mental functioning, mood or demeanor in the courtroom.' "  
Burgess
, 176 Ill. 2d at 302-03.

Based on this evidence, the supreme court chose to "depart from [its] previous practice of automatic reversal and to make a case-specific inquiry into the psychotropic drugs administered to this particular defendant."  
Burgess
, 176 Ill. 2d at 303.  According to the court, "we should not automatically assume that every psychotropic drug will inevitably render the person taking it unfit for purposes of trial or sentencing, and we therefore conclude that retrospective hearings are sometimes proper."  
Burgess
, 176 Ill. 2d at 304.  The court concluded that the evidence presented at the supplemental hearing "compels the conclusion that the defendant was suffering no impairment as a result of his ingestion of psychotropic drugs during the time of his trial and sentencing hearing."  
Burgess
, 176 Ill. 2d at 304.  Accordingly, he was not entitled to an automatic reversal and his convictions were affirmed. 

C

 The 
Burgess
 court seemingly has counseled that, in some cases, an "after-the-fact" assessment of a defendant's fitness at the time of trial may be appropriate, even though the court had previously and consistently rejected the notion of conducting such retrospective hearings.  
Burgess
, 176 Ill. 2d at 325 (Harrison, J., dissenting); see 
Birdsall
, 172 Ill. 2d at 480; 
Gevas
, 166 Ill. 2d at 471.  The court made no mention of overruling 
Brandon
 or any of its progeny.  Due to the very recent nature of the 
Burgess
 decision, no district of this court has yet ruled on which of the diametrically opposed approaches, 
Burgess
 or 
Brandon
, to follow.  

We believe that, while 
Burgess
 represents a departure from the rule of automatic reversal, it is still entirely consistent with the fundamental underpinning of 
Brandon
--to protect the due process rights of a defendant who ingests psychotropic medication.  Rather than mandating an automatic reversal in such cases, 
Burgess
 counsels that a reviewing court may examine the record to determine whether a defendant who ingests psychotropic medication was able to receive a fair trial in the absence of a fitness hearing.  Simply because a defendant was taking psychotropic medication does not necessarily mean that he was incompetent and unfit for trial and that any proceedings would violate his due process rights.  See 
Burgess
, 176 Ill. 2d at 304.  Rather, we read 
Burgess
 to mean that, when the record reveals that a defendant was ingesting psychotropic medication at the time of trial or sentencing and did not receive a fitness hearing, we may review the record, rather than automatically reversing that defendant's conviction, and determine whether the defendant received a fair trial despite the presence of psychotropic medication.  The end result of this procedure is the same--under either the 
Brandon
 reversal or the 
Burgess
 review, we 

are still protecting the defendant's right to a fair trial.

D

In this case, before trial began, the trial court was provided with a psychological evaluation of defendant.  The report detailed defendant's use of Thorazine, an antipsychotic drug, and his subsequent switch to Stelazine, another similar psychotropic medication.  According to the report, once defendant's medicine was changed to Stelazine, defendant's

"attitude and demeanor were remarkably different. *** Absent were the hostile and paranoid tones to his voice.  He seemed desirous of moving along with the court procedures. *** His thoughts were more goal oriented and his mood seemed brighter.  The jail psychologist reported that [defendant's] confrontations with the corrections officers had lessened and that he had become more cooperative.  *** [Defendant] seemed more pleased to cooperate with his attorney and to trust his judgment."

The report further commented that defendant was "able to participate in the court process[,] *** accurately understand[] the court procedures and know[] the differing roles of the court personnel."  Moreover, defendant was "able to recall and relate occurrences" and to "cooperate with his counsel."  The report concluded that despite suffering from "Schizophrenia, paranoid type," defendant was "fit to stand trial."

On August 5, 1994, after the completion of the psychological evaluation, defense counsel told the trial court that "[t]he fitness issue is not viable at this time.  You got a report."  On January 23, 1995, the day trial began, defense counsel reiterated that defendant was "competent synthetically. *** The medicine *** has been revised to Stelazine."  Thus, before trial commenced, the parties and the trial court were aware that defendant was being medicated, but both the psychological evaluator and defense counsel believed defendant was fit for trial.

After the trial ended, the trial court held a hearing on defendant's motion for new trial based on ineffective assistance of counsel.  At the hearing, defendant admitted that he actively participated in his defense.  For example, defendant recalled that during 
voir dire
 he instructed his counsel to strike a particular juror because she had previously been the victim of a burglary.  Defendant further recalled his dislike for another juror because he believed that she knew the complainants.  Additionally, defendant recalled instructing his trial attorney to put forth a defense of insanity as to the charged offenses and engaging in several discussions with counsel regarding such a defense.

The sum of this evidence demonstrates that, like the defendant in 
Burgess
, defendant here was fit to stand trial despite his use of psychotropic medication and the lack of a fitness hearing.  We recognize that we do not have the amount of evidence as that reviewed by the 
Burgess
 court because we do not have the benefit of a supplemental hearing.  However, like the defendant in 
Burgess
, defendant in this case actively participated in his defense.  As did the defendant in 
Burgess
, defendant here discussed various aspects of his case with counsel, participated in 
voir dire
, and remained alert and functioning throughout the trial and sentencing.  See 
Burgess
, 176 Ill. 2d at 301-02.  Defendant here perhaps participated to an even greater extent than did the defendant in 
Burgess
; defendant here was so competent that he was able to discuss a possible insanity defense with counsel.  Given defendant's obvious active participation in his case and the documented improvement he showed when his medication was altered, we find no evidence that his due process rights were violated by the absence of a fitness hearing.

While defendant's participation in this case compares favorably to that described by the 
Burgess
 court, we note that it is in stark contrast to the defendant's abilities in 
Brandon
.  In 
Brandon
, for example, the evidence demonstrated that, in addition to taking psychotropic medication, the defendant suffered from a learning disability, functioned in the third percentile for people in his age in terms of words he could understand and process, functioned in the fifth percentile in memory capability and " 'would not really be able to understand the proceedings in order to be able to share [information with counsel].' "  
Brandon
, 162 Ill. 2d at 454.  In contrast to the defendant in 
Brandon
, but similar to the defendant in 
Burgess
, defendant here was able to participate fully in his defense, despite his ingestion of psychotropic medication.  Therefore, consistent with 
Burgess
, we find that defendant is not entitled to an automatic reversal, fitness hearing, and new trial.

III

Defendant's third contention on appeal is that the jury was improperly instructed as to the definition of a "dwelling."  The jury was given the following definition of "dwelling," as adapted from Illinois Pattern Jury Instructions, Criminal, No. 4.03(1) (3d ed. 1992) (hereinafter IPI Criminal 3d No. 4.03(1)): "The word 'dwelling' means a building or portion of a building which is used or intended for use as a human habitation, home, or residence."  However, the Committee Note to this section states that IPI Criminal 3d No. 4.03(2) should be given "in conjunction with residential burglary."  IPI Criminal 3d No. 4.03, Committee Note, at 92.  In pertinent part, IPI Criminal 3d No. 4.03(2) defines "dwelling" as an apartment "in which at the time of the alleged offense the *** (occupants) *** actually reside, or in their absence, intend within a reasonable period of time to reside."   IPI Criminal 3d No. 4.03(2).  Therefore, according to defendant, because the jury should have been instructed with IPI Criminal 3d No. 4.03(2) rather than with IPI Criminal 3d No. 4.03(1), he is entitled to a new trial.

It is well settled that both an objection at trial and a written posttrial motion raising the same issue are required to preserve allegations of error for appellate review.  
People v. Enoch
, 122 Ill. 2d 176, 186 (1988); 
People v. Stokes
, 281 Ill. App. 3d 972, 976 (1996).  The failure to comply with these requirements constitutes a waiver of the alleged error.  
Enoch
, 122 Ill. 2d at 186.  However, pursuant to Supreme Court Rule 451(c) (134 Ill. 2d R. 451(c)), substantial defects in jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require."  134 Ill. 2d R. 451(c).  

Defendant concedes that he has waived consideration of this issue by failing to object at trial.  However, the essence of a fair trial is ensuring that the jury is provided with the correct legal principles so that it may reach the proper conclusion based on the law and the evidence.  
People v. Novak
, 163 Ill. 2d 93, 115-16 (1994).  Thus, because of the importance of jury instructions, and principles of waiver notwithstanding, we will review the merits of defendant's contention.

In this case, the trial court erred in improperly tendering to the jury IPI Criminal 3d No. 4.03(1) when it should have given the jury IPI Criminal 3d No. 4.03(2).  See IPI Criminal 3d No. 4.03, Committee Note, at 92.  An instructional error is harmless if it can be shown that the trial result would not have been different if the proper instruction had been given.  
People v. Johnson
, 146 Ill. 2d 109, 137 (1991).

The jury was told that a "dwelling" is a building or portion thereof used or intended for use as a place for human habitation.  See IPI Criminal 3d No. 4.03(1).  Instead, the jury should have been told that a "dwelling" is an apartment in which, at the time of the offense, humans actually reside.  See IPI Criminal 3d No. 4.03(2).  Under either definition, a "dwelling" is a place where people live.  Therefore, the jury was not misled by the improper instruction.  Nothing in the record indicates that the result of the trial would have been different had the proper instruction been given.  Accordingly, the instructional error was harmless beyond a reasonable doubt.  See 
Johnson
, 146 Ill. 2d at 137.

Defendant's reliance on our decision in 
People v. Donoho
, 245 Ill. App. 3d 938 (1993), is misplaced.  
In 
Donoho
, the defendant was convicted of residential burglary and burglary in connection with an incident that occurred in the complainant's attached garage.  The jury was instructed that a "dwelling" meant " 'a building or portion of a building which is used or intended for use as a human habitation, home or residence.' "  
Donoho
, 245 Ill. App. 3d at 939.  
In other words, the jury in 
Donoho
, as was the case here, was given what is now IPI Criminal 3d No. 4.03(1) instead of the proper instruction, which is now IPI Criminal 3d No. 4.03(2).  The proper instruction would have defined "dwelling" as " 'a house, apartment, mobile home, trailer, or other living quarters in which *** the owners or occupants actually reside.' "  
Donoho
, 245 Ill. App. 3d at 941, quoting Ill. Rev. Stat. 1989, ch. 38, par. 2--6(b).  We reversed the defendant's conviction and remanded the case for a new trial because of the instructional error.  We based our decision on the fact that an attached garage is not necessarily "a house, apartment, mobile home, trailer, or other living quarters in which *** the owners or occupants actually reside."  As such, the defendant may have been acquitted of the residential burglary charge had the proper instruction been given.  
Donoho
, 245 Ill. App. 3d at 941.

Unlike the attached garage in 
Donoho
, there is no doubt that the complainants' apartment in this case constitutes a "dwelling" under either definition contained in IPI Criminal 3d No. 4.03.  Additionally, in contrast to our finding in 
Donoho
, nothing in the record before us indicates that the jury may have acquitted defendant of residential burglary had the proper instruction been given.  Thus, the instructional error in this case was harmless.

IV

The material in this section is nonpublishable pursuant to Supreme Court Rule 23.  

Nonpublishable material under Supreme Court Rule 23 omitted.

CONCLUSION

As part of our judgment, we grant the State's request for fees pursuant to section 4--2002(a) of the Counties Code (55 ILCS 5/4--2002(a) (West 1994)) and 
People v. Nicholls
, 71 Ill. 2d 166 (1978).

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

INGLIS and HUTCHINSON, JJ., concur.